

May 1, 2024

<u>**VIA E-MAIL**</u>
Honorable Leigh Martin May
United States District Court, Northern District of Georgia
2167 U.S. Courthouse
75 Ted Turner Drive
Atlanta, GA 30303

      Re:    In Re Paragard IUD Products Liability Litigation
              Case No. 1:20-md-2974-LMM

Dear Judge May:

Over the past few months, Plaintiffs' Leadership and Defense counsel have conducted multiple meet-and-confers to discuss Defendants' late production of documents. One of these meetings included an in-person document summit on February 2, 2024, during which time Mr. Morris indicated that one of the reasons for Defendants' late production of responsive materials involved Defendants' use of Technology Assisted Review ("TAR"). Mr. Morris stated that the Teva Defendants[1] intended to make significant supplemental productions, in part, because the Teva Defendants had been "retraining TAR" for several months leading up to the February 2, 2024, summit. This was the first time that Plaintiffs' Leadership had been made aware of (1) the need to retrain TAR and (2) Defendants' ongoing efforts to do so.

Defendants' unilateral actions violated this Court's ESI Protocol (ECF No. 128) which required Defendants to meet and confer with Plaintiffs' Leadership on the TAR "methodology and workflow[2]." Plaintiffs ask that the Court allow Plaintiffs' Leadership to participate in a sampling process to ensure the parties agree on the effectiveness of the retrained TAR.

---

[1] The February 2, 2024, summit was conducted with Lead Co-Counsel for Teva, Mr. Morris and Ms. Farrell, as well as Co-Liaison Counsel, Ms. Ng. Lead Counsel for the Cooper Defendants did not participate in the meet-and-confer.

[2] See Dkt. 128 at pg. 15, B.2: "The Producing Party agrees to evaluate the desirability of using TAR to limit review of custodial ESI materials and other unstructured ESI (if, at the Producing Party's discretion, review is planned) prior to production. If the event that a Producing Party decides that use of TAR process is desirable, the Parties agree to meet and confer to discuss the planned TAR methodology and workflow."

April 22, 2024
Page 2

## What is TAR[3]?

Technology-assisted review (TAR) is the use of artificial intelligence and algorithms to identify relevant documents based on some element of human training. It is a process that can greatly trim down e-discovery review time because once the computer is trained to recognize tagging patterns, relevant tags are applied to terabytes of documents in a fraction of the time that it would take human reviewers. TAR[4] is a type of technology, or technology assisted review, that allows a party to expedite the review and organization of large volumes of electronically stored information through the use of software or predictive technology.

At a high level, attorneys initially "train an algorithm to recognize and distinguish between likely responsive and non-responsive documents by seeding the TAR system with documents related to the litigation. Essentially the TAR algorithm is "taught" about the litigation by the parties.  In theory, and in the best case circumstances, the TAR process is dynamic and the TAR algorithm continues to learn (and, theoretically improve) as it reviews an additional corpus of documents. All documents organized and reviewed by TAR are then scored on a relevancy scale, regardless of their responsiveness.

## Defendants' Use of TAR

In late 2022, the parties discussed the Defendants' use of TAR for purposes of reviewing custodial file material. Prior counsel for the Teva stated "attorney reviewers were trained by Ulmer & Berne attorneys, including myself, and training materials provided to reviewers were developed and drafted solely for purposes of defending our clients in this MDL."  Ltr. From G. Saelinger to E. Wallace (Oct. 4, 2022).

At the same time, the parties were engaging in an extensive dialogue related to the meaning of the term "relevance" as it related to document review and production. During the September 27, 2022 status conference, Plaintiffs' raised their concerns that Defendants' were construing the term relevance too narrowly—potentially cutting off documents from review. In response, Ms. Saelinger stated:

> "And at any given point, your honor, we've had up to 50 individuals who have been hired to work on this review process and production process, not including people in our office. Then the reviewers conduct the review. Under the ESI protocol which was negotiated with the parties, what we are doing is a continuous active learning prioritized review, which essentially means that the plaintiffs are getting the most responsive, most relevant, most meaty stuff first. Then what happens, your honor, is that the computer gets to a point that just hypothetically say there are 100,000 documents you start off with, and 80,000 of those documents have been reviewed.

---

[3] Predictive coding or TAR (also called CAL or Computer Active Learning) has emerged as a far more accurate means of producing responsive ESI in discovery than manual human review of keyword searches. *Progressive Cas. Ins. Co. v. Delaney*, No. 2:11-CV-00678-LRH, 2014 WL 3563467, at *8 (D. Nev. July 18, 2014). "Studies show it is far more accurate than human review or keyword searches which have their own limitations." *See In re Lithium Ion Batteries Antitrust Litig.*, No. 13MD02420 YGR (DMR), 2015 WL 833681, at *3 (N.D. Cal. Feb. 24, 2015).

[4] A cornerstone of electronic discovery, including TAR implementation, is that "'[e]lectronic discovery requires cooperation between opposing counsel and transparency in all aspects of preservation and production of ESI.'" *Da Silva Moore v. Publicis Groupe*, 287 F.R.D. at 191 (*quoting William A. Gross Constr. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) (Peck, M.J.)).

April 22, 2024
Page 3

The computer says, hey, there's 20,000 left. We could cut off review because the likelihood that anything relevant or responsive is going to be found in that 20,000 is pretty slim. **So at that point under the ESI Protocol, if we determine that we would cut off review and not look at those 20,000, we have a meet and confer obligation with the plaintiffs to say, you know, to discuss are they okay with that , or do they object to that, in which case we could need to decide where to proceed.**"

Sept. 27, 2022, Hearing Transcript pp. 19-21.

Ms. Saelinger letter clarified "[Defendants] have not yet determined to cut off review for any custodial materials based upon the Brainspace active review process. When we reach a decision to do so, we will provide you information on our validation process in a meet-and-confer as agreed to in the ESI order." G. Saelinger Ltr. to E. Wallace (Oct 4., 2022). A meet and confer on the validation process never occurred.

**Defendants Retraining TAR**

During the February 2024 summit, Plaintiffs' Leadership pressed current counsel for the Defendants to explain why the Defendants continued to produce thousands of responsive documents months (if not years) after prior Defense counsel certified completeness. Moreover, Plaintiffs' Leadership likewise questioned how this could be satisfied with the sufficiency of the production, and any related certifications of completeness, given the prior history of late productions.[5]

It was during completeness discussion that Mr. Morris stated that, since being appointed as co-lead counsel, Teva had begun to retrain TAR, which lead to the production (or forthcoming production) of additional documents. Through a series of subsequent meet-and-confers, Defense counsel declined to provide any examples of documents used to train or retrain TAR. To date, Defendants:

(1) have been unwilling to provide documents showing how TAR was originally trained or retrained,
(2) have not provided seed or sample sets of documents (either responsive or nonresponsive), and
(3) have not allowed Plaintiffs any insight into the process or workflow for the Continuous Active Learning process.

Recently, Counsel provided the Wave TAR reports with the confidence rates, showing 95% confidence rate/5% confidence interval (or exception where the entire population in the Wave was reviewed).   However, Defense counsel have now declined to allow Plaintiffs' Leadership to participate in any further sampling process, validation or have input into the determination of statistical verification of the TAR process applied.

As evidenced by the ongoing discovery disputes, the Parties were not in agreement and have no confidence in the TAR workflow enacted without the transparency required under the ESI protocol. As the Parties were not in agreement as to the term "relevance" as it related to document review and production, at the time the TAR system was being trained as to a specified confidence level, it is clear there was a gap in agreement as to the sample set Defendants used for TAR training.

---

[5] Plaintiffs will provide the court with demonstrative charts summarizing production history at the May 6, 2024 status conference.

April 22, 2024
Page 4

To begin with—Plaintiffs are unaware of which documents were selected in the first phase of technology-assisted review when Defendants created and reviewed the control set of documents. This is true of both the original and retrained TAR process.

There are many ways to gather data for a control set, most of which involve sampling. A quick and easy way to generate a sample set is to use random sampling—to return a user-specified percentage of the total document population but this is not statistically representative of the population as a whole. Another method is to use Simple Random Sampling ("SRS") which is a statistically representative sample based on the total number of documents in the population (and involves agreed upon statistical parameters such as confidence level and margin of error). This is an unbiased, random selection of documents that is a good representative of the document corpus. Parties often add documents from a saved search (using agreed search terms or an agreed upon set of "responsive documents"). The use of judgmental documents allow the addition of documents to the training set which are known to be responsive—but this can shift the confidence level. Plaintiffs are unaware and have been unable to identify from any meet and confer what documents and what process was utilized for the sample set(s) utilized for training the TAR system.

In TAR, a confidence level is the percent certainty that the proportion of content-relevant documents in the sample set is the same as the proportion of content-relevant documents in the population, within a margin of error. Increasing the confidence level will increase the sample size, but will also give better statistical inference into the population. Plaintiffs' have no arguments with the confidence level selected by Defendants (95%) but without insight into the sample set(s) used and overall training process (or transparency into the seed sets _or_ the rejected documents from the samples, i.e., non-relevant and non-privileged documents) it is unlikely this will occur. It is important to analyze numerical and graphical representations of how effectively TAR learned after multiple iterations – after each sample set, after each Wave of TAR training (when reports were not timely provided to Plaintiffs), and before Defendants elected to process with retraining. A further meet-and-confer between the Parties should have occurred at multiple steps within the TAR training or retraining methodology for full transparency – and did not.[6] This level of transparency and inclusion of both parties is being requested moving forward to validate the effectiveness of the retrained TAR.

**Case Law Supports Plaintiffs' Involvement**

It is widely recognized that "TAR is cheaper, more efficient and superior to keyword searching" *Hyles v. New York City*, No. 10-CIV-3119, 2016 WL 4077114, at *2 (S.D.N.Y. Aug. 1, 2016) (collecting studies). Courts have determined that responding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronically stored information. Ibid. at *3 (citing The Sedona Principles: Second Edition, Best Practices Recommendations & Principles for Addressing Electronic Document Production, Principle 6 (available at www.TheSedonaConference.org))."

A cornerstone of TAR is a good faith agreement between the parties on methodology, workflow, training (whether by one party or both), as well as a validation process as well as appropriate cut off review. Case law discussing the use of computer-assisted methodologies to review documents for production emphasizes the need for cooperation and transparency. *See Youngevity Int'l, Corp. v. Smith*, No. 16-cv-00704-BTM (JLB), 2019 WL 1542300, at *12 (S.D. Cal. Apr. 9, 2019)

---

[6] Plaintiffs' Leadership has proposed using a transparent process similar to that used in the 3M Litigation for retraining (MDL 2885, PTO No. 4). Defendants have declined.

April 22, 2024
Page 5

"Technology-assisted review of ESI does require an 'unprecedented degree of transparency and cooperation among counsel' in the review and production of ESI responsive to discovery requests. *Progressive Cas. Ins. Co.*, 2014 WL 3563467, at *10 (D. Nev. July 18, 2014).

In this regard, courts typically 'have required the producing party to provide the requesting party with full disclosure about the technology used, the process, and the methodology, including the documents used to 'train' the computer." *Id.*  This cooperation and transparency was intended under the Parties ESI Protocol but has been lacking in reality throughout the discovery process in actuality.

In light of the foregoing, Plaintiffs respectfully ask that Court compel a sampling process to include equal participation from all parties and statistical validation.

Sincerely,

Lee A. Floyd

LAF/dec