Matthew A. Luber, Esq.–NJ ID # 017302010
  mal@njlegal.com
William L. Carr, Esq.–NJ ID # 014112005
  wlc@njlegal.com
Tyler J. Burrell, Esq.–NJ ID # 377942021
  tjb@njlegal.com
McOMBER McOMBER & LUBER, P.C.
39 East Main Street
Marlton, New Jersey 08053
(856) 985-9800
*Attorneys for Plaintiff Carolyn Paolucci*

| | |
|---|---|
| CAROLYN PAOLUCCI,<br><br>                              Plaintiff,<br><br>vs.<br><br>THE COOPER COMPANIES, INC.;<br>COOPERSURGICAL, INC.; PRISCILLA<br>TAVENER; JENNIFER GATES;<br>COURTNEY BOYLE; GRETA KOLCON;<br>ABC CORPORATIONS 1-5 (fictitious names<br>describing presently unidentified business<br>entities); and JOHN DOES 1-5 (fictitious<br>names describing presently unidentified<br>individuals),<br><br>                              Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION<br>BURLINGTON COUNTY<br><br>DOCKET NO.:<br><br><u>Civil Action</u><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

Plaintiff Carolyn Paolucci ("Plaintiff"), by way of Complaint against Defendant The Cooper Companies, Inc. ("Defendant CooperCompanies"); Defendant CooperSurgical, Inc. ("Defendant CooperSurgical") (collectively "Corporate Defendants"); Defendant Priscilla Tavener ("Defendant Tavener"); Defendant Jennifer Gates ("Defendant Gates"); Defendant Courtney Boyle ("Defendant Boyle"); and Defendant Greta Kolcon ("Defendant Kolcon") (collectively "Individual Defendants") (collectively "Defendants") alleges as follows:

## **INTRODUCTION**

This is an action brough under the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1 *et seq.* ("CEPA"), against Defendants willing to do whatever is necessary,

including ignoring their federal statutory and regulatory obligations to ensure the safety of those who take prescription medicines, to maximize pecuniary gain. Plaintiff, an experienced brand manager in the pharmaceutical space, was subjected to retaliation for simply doing her job with integrity and for objecting to prohibited conduct. For years, Plaintiff reported to her direct supervisor, her supervisor's supervisor, human resources, and even the legal department, that the practices of Defendant CooperCompanies and Defendant CooperSurgical violated federal statutory and regulatory laws. In direct retaliation, Defendants buried their heads in the sand, made Plaintiff's working conditions more difficult, initially discouraged Plaintiff from seeking an investigation, and ultimately terminated her employment. Accordingly, Plaintiff brings this lawsuit to recover all the damages and remedies available under CEPA.

## PARTIES

1.      Plaintiff is an individual who resides at 2214 Churchill Downs Way, Cherry Hill, New Jersey, and, at all times relevant hereto, was employed by Corporate Defendants as a Senior Brand Manager most recently working remotely from her home in New Jersey. At all relevant times, Plaintiff is a "person," "inhabitant," and citizen of New Jersey.

2.      Defendant CooperCompanies is a foreign for-profit corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 6101 Bollinger Canyon Road, Suite 500, San Ramon, California. At all times relevant hereto, Defendant CooperCompanies is an "employer" as defined under CEPA, N.J.S.A. 34:19-1, *et seq.*

3.      Defendant CooperSurgical is a foreign for-profit corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 75 Corporate Drive, Trumbull, Connecticut. At all times relevant hereto, Defendant CooperSurgical is an "employer" as defined under CEPA, N.J.S.A. 34:19-1, *et seq.*

4.    Defendant Tavener is an individual and, at all relevant times hereto, is employed by Corporate Defendants as Senior Director of PARAGARD® Marketing. Upon information and belief, Defendant Tavener is a resident of Burlington County, New Jersey. This claim is brought against Defendant Tavener in her individual capacity and as an agent Corporate Defendants during the course of her employment.

5.    Defendant Gates is an individual and, at all relevant times hereto, is employed by Corporate Defendants as Vice President, Sales and Marketing. Upon information and belief, Defendant Gates is a resident of New York. This claim is brought against Defendant Gates in her individual capacity and as an agent of Corporate Defendants during the course of her employment.

6.    Defendant Boyle is an individual and, at all relevant times hereto, is employed by Corporate Defendants as Director, Human Resources. Upon information and belief, Defendant Boyle is a resident of New York. This claim is brought against Defendant Boyle in her individual capacity and as an agent of Corporate Defendants during the course of her employment.

7.    Defendant Kolcon is an individual and, at all relevant times hereto, is employed by Corporate Defendants as Senior Counsel, Director of Labor Law & Litigation. Upon information and belief, Defendant Kolcon is a resident of New York. This claim is brought against Defendant Kolcon in her individual capacity and as an agent of Corporate Defendants during the course of her employment.

8.    At all relevant times, Defendant CooperCompanies and Defendant CooperSurgical have been single and joint employers of Plaintiff and others similarly situated within the meaning of New Jersey law. In this regard, their operations are interrelated and unified, and they share common management, centralized control of labor relations, common ownership, common control, common website, common business purposes, and interrelated business goals. In addition,

3

they jointly determine and manage the pay practices, rates of employee pay and method of payment, maintenance of employee records and personnel policies, practices and decisions with respect to the employees.

9.    Defendants ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendants, and/or currently unidentified business entities responsible for the creation and/or implementation of harassment or anti-retaliation policies of Corporate Defendants, and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced herein.

10.    Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of harassment or anti-retaliation policies of Corporate Defendants and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

## **FACTS COMMON TO ALL CLAIMS**

11.    Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

I.    **Plaintiff's Experience with PARAGARD® Before Joining Defendant CooperSurgical**

12.    From July 2013 to June 2015, Plaintiff served as Account Supervisor at the advertising agency of record for PARAGARD® the Women's Health Business Unit of Teva Pharmaceutical Industries Ltd. ("Teva").

13.    In June 2015, Plaintiff was hired to join the marketing team of Teva's Women's Health Business Unit.

14.     Plaintiff began her employment at Teva on June 27, 2015, as a Marketing/Field Sales Liaison for the Women's Health Business Unit.

15.     Plaintiff supported Teva's PARAGARD® intrauterine device product.

16.     Plaintiff was almost immediately assigned increased responsibilities, and within a few months Plaintiff was asked to take on the responsibilities of the Senior Manager of PARAGARD® Marketing following an unexpected team vacancy.

17.     Shortly thereafter, in or around April 2016, Plaintiff was promoted to Brand Manager for PARAGARD® under the Women's Health Business Unit of Teva.

## II.     Defendant CooperCompanies Purchases PARAGARD® from Teva

18.     On or about November 1, 2017, Defendant CooperCompanies announced its acquisition of PARAGARD® from Teva for a purchase price of approximately $1.1 billion.[1]

19.     Upon information and belief, Defendant CooperCompanies marketed PARAGARD® through its subsidiary, Defendant CooperSurgical.

20.     Defendant CooperSurgical is a "leading women's healthcare and fertility company dedicated to putting time on the side of women, babies, and families at the healthcare moments that matter most in life."[2]

21.     On November 2, 2017, Plaintiff was offered the position of Senior Brand Manager of Marketing with Defendant CooperSurgical in connection with Defendant CooperCompanies' acquisition of PARAGARD®.

22.     Plaintiff was one of only a few home-office employees from Teva who transitioned to Defendant CooperSurgical.

---

[1] See https://www.coopersurgical.com/wp-content/uploads/The-Cooper-Companies-Completes-Acquisition-of-PARAGARD-IUD-From-Teva.pdf.

[2] See https://www.coopersurgical.com/about-us/.

23.     Plaintiff initially reported to the Vice-President, Marketing, at Defendant CooperSurgical.

24.     Plaintiff was never provided with a formal job description but was told she would assume responsibilities consistent with how the brand marketers functioned at Teva.

25.     From approximately November 2017 to April 2018, Plaintiff worked closely with Defendant CooperSurgical's C-Suite Executives and alongside Defendant CooperSurgical's acquisition integration team to merge the PARAGARD® business from Teva into Defendant CooperSurgical.

26.     Plaintiff's responsibilities were significant and included supporting setting up the entire marketing department (brand strategy, business strategy, healthcare practitioner promotions, consumer promotions, web, distribution, customer experience, customer service, etc.), as well as supporting setting up various other departments, vendors, and personnel needed to conduct business in a manner similar to Teva Pharmaceuticals, including marketing operations, pharmaceutical promotion review process, sales training, etc.

### III.    Defendant CooperSurgical Was Not Prepared to Comply with Federal Regulations Applicable to Pharmaceutical Companies

27.     The Food and Drug Administration ("FDA") has authority to regulate medical devices and pharmaceuticals pursuant to the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301-399i, and the regulations promulgated thereunder.

28.     Medical devices and pharmaceuticals are subject to different regulations.

29.     In fact, the FDA has separate divisions to regulate each.

30.     "FDA's Center for Devices and Radiological Health (CDRH) is responsible for regulating firms who manufacture, repackage, relabel, and/or import medical devices sold in the United States."[3]

31.     "The Center for Drug Evaluation and Research (CDER) ensures that safe and effective drugs are available to improve the health of the people in the United States."[4]

32.     The CDER has a number of offices and divisions relative to the regulation of pharmaceuticals including, but not limited to, the Office of Prescription Drug Promotion ("OPDP").[5]

33.     "OPDP protects the public health by helping to ensure that prescription drug promotion is truthful, balanced, and accurately communicated. This is accomplished through comprehensive surveillance, compliance, research, and education programs, and by fostering better communication of labeling and promotional information to both healthcare providers and consumers."[6]

34.     It became clear to Plaintiff almost immediately after she began working at Defendant CooperSurgical that Defendant CooperSurgical, formerly a medical device company, did not have the infrastructure or resources in place to comply with the separate federal regulations applicable to pharmaceuticals like PARAGARD®.

_____

[3] https://www.fda.gov/medical-devices/device-advice-comprehensive-regulatory-assistance/overview-device-regulation.

[4] https://www.fda.gov/drugs.

[5] https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-offices-and-divisions.

[6] https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/office-prescription-drug-promotion-opdp.

35.    Plaintiff reported numerous areas to her manager that needed additional support based on her experience with pharmaceutical regulation at Teva.

36.    For example, Plaintiff reported to her manager that Defendant CooperSurgical needed to hire a promotional regulatory reviewer with pharmaceutical experience to ensure Defendant CooperSurgical complied with its obligations under the FDCA and regulations promulgated thereunder by FDA and enforced by OPDP.

37.    Plaintiff also reported to her manager that Defendant CooperSurgical needed to hire a compliance officer who could implement policies and procedures to ensure compliance with the Physician Payment Sunshine Act ("Sunshine Act"), 42 U.S.C. § 1320a-7h, and FDA regulations that require postmarketing reporting of adverse drug experiences, 21 C.F.R. 314.80.

38.    Plaintiff also requested additional headcount on the marketing team to mirror the team structure that was in place at Teva.

39.    Plaintiff's manager informed Plaintiff that Defendant CooperSurgical's senior management decided not to add a compliance officer or additional marketing headcount.

40.    Plaintiff's manager also advised Plaintiff that Defendant CooperSurgical's senior management determined the current regulatory staff were sufficient, even though it was clear that these individuals were not familiar with pharmaceutical laws or promotional regulations and only had a medical device background.

41.    Plaintiff was dismayed by this response, but she continued to carry out her job function to the best of her ability with the knowledge of pharmaceutical laws and regulations she gained from her prior employer, Teva.

42.    In or around mid-2018, Defendant CooperSurgical hired a new Vice-President, Marketing, for PARAGARD®, to whom Plaintiff was assigned to report.

43.     On several occasions, Plaintiff engaged in protected conduct by raising concerns to her manager that some elements of the campaign execution were riskier than what would have been approved by Teva regulatory.

44.     Plaintiff's manager advised she had gained alignment from senior management to press forward with the campaign as is.

45.     Plaintiff reiterated concerns to her manager that Defendant CooperSurgical needed an experienced pharmaceutical promotional regulatory staff so Plaintiff could carry out her job effectively and feel confident that the various activities she was assigned to complete complied with FDA regulations.

46.     Plaintiff informed her manager that she was consistently being met with situations where the regulatory department's lack of pharmaceutical knowledge was concerning to Plaintiff and causing her to not be able to carry out her job.

47.     For example, Plaintiff reported to her manager that the legal and regulatory reviewers did not have appropriate knowledge when Plaintiff would seek their guidance on how to execute the significant number of multichannel promotional activities that Plaintiff was assigned to complete. Instead, these departments would push the onus on Plaintiff, which caused Plaintiff to work more hours on each project and feel significant pressure.

48.     Plaintiff also reported to her manager that she was concerned that regulatory staff were not taking ownership on managing versions or updates to PARAGARD®'s Full Prescribing Information, Important Safety Information, and Brief Summary, which was standard practice at Teva.

49.     Plaintiff's manager acknowledged Plaintiff's concerns and informed Plaintiff that she made numerous reports to Defendant CooperSurgical's Senior Management to have these issues addressed.

50.     Plaintiff's manager instructed Plaintiff that work could not stop despite the lack of resources and that Plaintiff was expected to continue to "do the best she could to get the work done", which Plaintiff continued to do to the best of her ability.

51.     In or around March 2019, Plaintiff reported to her manager that she received annual training from Defendant CooperSurgical's electronic training system on how to identify and report product complaints for "product's manufactured, distributed, serviced, or repaired by CooperSurgical" (which would include PARAGARD®), however, the training described Medical Devices only and omitted the identification of Pharmaceutical Adverse Events and Product Quality Complaints, as well as the reporting pathway Plaintiff was aware of for pharmaceuticals, including PARAGARD®.

52.     Defendant CooperSurgical is required to "report each adverse drug experience that is both serious and unexpected, whether foreign or domestic, as soon as possible but no later than 15 calendar days from initial receipt of the information." 21 C.F.R. 314.80(c)(1)(i).

53.     Defendant CooperSurgical is further required to "promptly investigate all adverse drug experiences that are the subject of these postmarketing 15-day Alert reports and must submit follow up reports within 15 calendar days of receipt of new information or as requested by FDA." 21 C.F.R. 314.80(c)(1)(ii).

54.     "Postmarketing safety data collection and adverse event reporting are critical elements of FDA's oversight of drugs and therapeutic biologics available to the American public"

because "[t]he testing that helps to establish the safety of products, such as drugs and therapeutic biologics, is typically conducted on small groups before FDA approves the products for sale."[7]

55.     Plaintiff reported to her manager that since becoming an employee of Cooper (then one-and-one-half years), Plaintiff never received a formalized Pharmaceutical Adverse Event or Product Quality Complaint identification and reporting training for PARAGARD® from Defendant CooperSurgical's training system, and Plaintiff relayed a concern that if it was confusing her, it was bound to be confusing other employees who were not as close to the business.

56.     Since Plaintiff was close to the business, she knew how to (and did) correctly make the reports but was concerned that other employees did not, and confirmed with other employee's that they did not receive the training.

57.     Plaintiff also told her manager there was a need to train vendors who engaged with customers and that there were numerous versions of the training and policy floating around from Teva in an informal fashion, but that it was not being managed by regulatory in a streamlined fashion, as was done at Teva.

58.     Plaintiff also relayed that she had recently become aware that the reporting vendor's name, email address, and phone number had changed but had not been updated on the numerous training documents. Plaintiff expressed urgency that Defendant CooperSurgical's regulatory department take ownership of this as soon as possible so that Defendant CooperSurgical was not obstructing the reporting of post-marketing Adverse Events and Product Quality complaints.

---

[7] https://www.fda.gov/drugs/surveillance/postmarketing-adverse-event-reporting-compliance-program.

59.    Once again, Plaintiff engaged in protected conduct by blowing the whistle on the potential FDA regulatory violations. Plaintiff also provided information on how this was handled at Teva to Defendant CooperSurgical's regulatory department.

60.    Plaintiff's manager advised Plaintiff that she raised this issue with management, and instructed Plaintiff to piece together, modify, and disseminate the policy and training documents herself until Defendant CooperSurgical's regulation department responded to the request. Plaintiff received no other explanation, and her concerns were otherwise ignored.

61.    Plaintiff also again reported that she needed guidelines for the fair market value of physician payments to ensure compliance with the Sunshine Act because Plaintiff was asked to execute a promotional activity with physicians who would be hired as spokespeople.

62.    In response, Plaintiff was directed to pull guidelines from her time with Teva and to come up with fair market value rates on her own as Defendant CooperSurgical was "working on getting a process in place."

**IV.    Plaintiff's Concerns Are Substantiated When FDA Issues "Untitled Letter" to Defendant CooperSurgical for Its Promotional Activities**

63.    On or about July 25, 2019, the FDA issued an "Untitled Letter"[8] to Defendant CooperSurgical with respect to a PARAGARD® campaign in which FDA advised that the current campaign made "false and misleading representations" in violation of the FDCA:

---

[8] *See* https://www.fda.gov/media/129526/download.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**                     Public Health Service

_____

Food and Drug Administration
Silver Spring, MD 20993

Kyle Hooper
Regulatory Affairs Associate
CooperSurgical, Inc.
75 Corporate Drive
Trumbull, CT  06611

**RE:  NDA 018680**
ParaGard® T380A INTRAUTERINE COPPER CONTRACEPTIVE
MA 578

Dear Mr. Hooper:

The Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration
(FDA) has reviewed a Direct-to-Consumer television advertisement (TV ad) entitled
"Paragard 30 sec DTC Ad (Musical)" (US-PAR-1800079) for ParaGard® T380A
INTRAUTERINE COPPER CONTRACEPTIVE (ParaGard) submitted by CooperSurgical, Inc.
(CooperSurgical) under cover of Form FDA 2253.  The FDA Bad Ad Program also received a
complaint regarding this TV ad.  This TV ad makes false or misleading representations about
the risks associated with ParaGard.  Thus, the TV ad misbrands ParaGard within the
meaning of the Federal Food, Drug and Cosmetic Act (FD&C Act) and makes its distribution
violative.  21 U.S.C. 352(n); 331(a); 321(n).  21 CFR 202.1(e)(1); (e)(5).  This violation is
concerning from a public health perspective because it creates a misleading impression
about the safety of ParaGard.

64.     Plaintiff's repeated concerns and complaints – which Defendants ignored – were

validated.

65.     In response to the FDA "Untitled Letter," Plaintiff was asked to revise the entire

campaign, which included between 50-75 collateral assets across eight media channels.

**V.      Plaintiff Is Assigned a New Supervisor Who Almost Immediately Begins to Retaliate
Against Plaintiff for Reporting Possible Violations of FDA Regulations**

66.     In or around December 2019, Defendant CooperSurgical hired a new Director of

Marketing for PARAGARD®, Defendant Tavener.

67.     Plaintiff was assigned to report to Defendant Tavener.

68.     Plaintiff also was asked to onboard Defendant Tavener.

69.    During the onboarding process, Plaintiff reported to Defendant Tavener that she had raised several issues that had not been addressed, including the need for Defendant CooperSurgical to (1) have experienced pharmaceutical regulatory staff; (2) provide employee and vendor training on how to report Pharmaceutical Adverse Event and Product Quality Complaints; and (3) provide guidance and standardized rates for the fair market value of payments to physicians under the Sunshine Act.

70.    Plaintiff stressed the urgency for compliance with these regulatory requirements.

71.    Defendant Tavener did not share Plaintiff's sense of urgency.

72.    In or around February 2020, Defendant Tavener asked Plaintiff to support her in leading a public relations activity for PARAGARD® in which healthcare providers would be hired as paid spokespeople for media engagements.

73.    Plaintiff informed Defendant Tavener orally and in writing that this activity was considered promotional, e.g., subject to labeling requirements for fair balance as required by the FDCA and the regulations promulgated thereunder, and therefore needed to be submitted to the Promotional Ad Review Committee for review and to the FDA's OPDP.

74.    Defendant Tavener responded that this program would not be submitted.

75.    Plaintiff pushed back with her concerns, explaining that failing to do so would violate FDA regulations. Rather than address those concerns, Defendant Tavener told Plaintiff the decision was final and, in retaliation, admonished Plaintiff to stop questioning her. Alarmingly, Defendant Tavener also directed Plaintiff to "***stop putting things in writing.***"

76.    It was clear to Plaintiff that Corporate Defendants were willing to deliberately evade FDA regulations.

14

77.    Plaintiff again responded that she was uncomfortable, she did not agree with this approach, and she needed to put her concerns in writing to protect herself and Defendant CooperSurgical especially considering the "Untitled Letter" Defendant CooperSurgical had received under Plaintiff's former manager's watch.

78.    To say the least, Defendant Tavener did not appreciate Plaintiff's response.

79.    Defendant Tavener proceeded to complete the rest of this activity on her own. In violation of law and over Plaintiff's objection, Defendant Tavener refused to follow the standard process for review of this promotional activity.

80.    Specifically, on February 14, 2020, Plaintiff circulated a draft with a comment to "PT," Defendant Tavener, that said:



81.    Defendant Tavener recirculated the draft on February 18, 2020, with Plaintiff's comment deleted and unaddressed.

82.    In March 2020, after having heard nothing in response to her request for the necessary postmarketing adverse event reporting training for employees, Plaintiff submitted an email to the confidential human resources inbox repeating her concerns:

**Carolyn Paolucci**

| | |
|---|---|
| **From:** | Carolyn Paolucci |
| **Sent:** | Thursday, March 12, 2020 12:46 PM |
| **To:** | HR Confidential |
| **Subject:** | Compliance Reporting Training |
| **Attachments:** | Handout, Global Complaint, MDR 3.11.20.pdf |

Hello,

I was just required to complete an official training module in our internal training system called "CooperSurgical Global Complaint Process, Procedures and Medical Device Reporting" (see attached for the training deck).

This training states "These procedures are applicable to allegations of product complaints for products manufactured, distributed, serviced, or repaired by CooperSurgical" (which would include the product I work on, Paragard)- however the policies and procedures described in this training are different than the policies and procedures that I have seen passed around for Paragard. I have worked for the company for 2.5 years and have never been formally communicated or trained on any company policies or procedures for my product in a similar fashion whereas I provide a confirmation of understanding and electronic signature.

That said, I would appreciate clarity as soon as possible so I can make sure I am being compliant with our company policies and procedures- as right now I am not clear on what they are- or what or when I am supposed to report.

As additional context- this is the same training I was required to complete last year at which point I queried to my manager and regulatory partners if this training was applicable to Paragard employees and I was verbally told no. I flagged to them that an official training should be created because if this is confusing me, it's definitely confusing other Paragard employees and now a year later (and 2.5 years after the acquisition) - I have still never been provided any formal training. At my past companies, this training was issued formally on a yearly basis with similar electronic signature.

The training I have received thus far from Cooper only appears to be for medical devices and Paragard is classified by FDA as a pharmaceutical- not a medical device- so my understanding is that the reporting regulations may be different. We also use a 3rd party to take adverse events and quality reports for Paragard- none of this is described in this training. The training reads as though I should be reporting to cooper global for Paragard and evaluating based on medical device regulations– and then goes on to describe med device regulations - I am genuinely confused as to how I am supposed to evaluate and handle reporting for Paragard because of this disconnect.

I have made my manager aware of this, but since the flags I have raised to this before have gone un-addressed for a long time, I wanted to formally document this with HR since my electronic signature is now on file twice saying I will comply with a global policy for reporting that contradicts a policy I was provided in an informal fashion.

Thanks,
Carolyn

83.    Plaintiff never received a response to her submission.

84.    During the same month, Defendant Tavener also began engaging in activities to assert her organizational power over Plaintiff and to diminish Plaintiff's stature in the company. Defendants overly scrutinized Plaintiff's activities in a deliberate effort to make Plaintiff's job more difficult, which was a concerted effort to compel Plaintiff's resignation and/or setup her unlawful pretext termination.

16

85.    Such conduct would not have occurred but for Plaintiff's internal complaints and her engaging protected whistleblowing conduct.

86.    For example, in retaliation, Plaintiff was no longer invited to on-going, executive-level, cross-functional meetings that Plaintiff previously had attended since her employment began in 2015.

87.    Plaintiff also was no longer asked to present to senior management because Defendant Tavener presented Plaintiff's work instead.

88.    Defendant Tavener engaged in emotional manipulation and gas-lighting by conveying to Plaintiff that "she lacked self-awareness," and was "mentally disorganized" making the day-to-day work environment distressing and hostile for Plaintiff.

89.    When Plaintiff was detail-oriented to ensure Defendant CooperSurgical complied with its regulatory obligations, Defendant Tavener told her she was "too in the weeds."

90.    Defendant Tavener falsely informed Plaintiff she was mismanaging vendor relationships, even though it was the vendors that were not fulfilling their duties and having a hard time keeping up with Defendant CooperSurgical's constantly changing regulatory guidance, which affected all of the Plaintiff's projects.

91.    Defendant Tavener even reprimanded Plaintiff for asking questions or making valid requests of vendors during telephone calls.

92.    Defendant Tavener also admonished Plaintiff not to engage in personal conversation or "small talk" with other employees at the beginning of conference calls, even though she does it, too.

93.    Defendant Tavener denied Plaintiff's requests for additional resources and support, despite Plaintiff continuously reporting that she was burnt out and overworked.

**VI.**    **Plaintiff Reports Another Possible Violation of FDA Regulations that Goes Ignored Until FDA Issues a "Warning Letter" to Defendant CooperSurgical**

94.    On October 6, 2020, Defendant CooperSurgical's public relations agency notified Defendant Tavener and Plaintiff that it had booked and run a spot on WBTS (NBC) "The Hub Today" with one of Defendant CooperSurgical's physician spokespeople.

95.    Plaintiff reviewed the segment and immediately concluded that it violated FDA guidelines.

96.    Plaintiff reported her concerns orally to Defendant Tavener because Defendant Tavener had previously admonished Plaintiff about putting her concerns in writing.

97.    Defendant Tavener openly dismissed Plaintiff's concerns and confirmed that the segment was "done based on what we agreed to" and then dismissively and degradingly responded to Plaintiff that the segment was not of concern and "was fine."

98.    From November 2020 to February 2021, in retaliation, Defendant Tavener continued to increase Plaintiff's level of responsibility and workloads and recommended Plaintiff attend more employee development trainings.

99.    On or about February 12, 2021, the FDA issued a "Warning Letter"[9] to Defendant CooperSurgical in connection with the spot on WBTS (NBC) "The Hub Today" that Plaintiff had previously reported concerns with.

---

[9] *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/coopersurgical-inc-613339-02122021.



DEPARTMENT OF HEALTH & HUMAN SERVICES                Public Health Service

Food and Drug Administration
Silver Spring, MD 20993

Holly Sheffield
President
CooperSurgical, Inc.
75 Corporate Drive
Trumbull, CT 06611

RE:   **NDA 018680**
      PARAGARD (intrauterine copper contraceptive)
      MA 628

## WARNING LETTER

Dear Ms. Sheffield:

The Office of Prescription Drug Promotion (OPDP) of the U.S. Food and Drug Administration
(FDA) has reviewed a direct-to-consumer video "sponsored by PARAGARD" (intrauterine
copper contraceptive) (Paragard). This promotional communication, a video, entitled
"Paragard: Family Planning During The Pandemic[,]" was presented on WBTS's *The Hub
Today*.[1] The video was submitted as a complaint to the FDA Bad Ad Program. The video is
false or misleading in that it presents efficacy claims for Paragard, but fails to communicate
any risk information associated with its use. Thus, the video misbrands Paragard within the
meaning of the Federal Food, Drug, and Cosmetic Act (FD&C Act) and makes its distribution
violative. 21 U.S.C. 352(a), (n); 321(n); 331(a). *See* 21 CFR 202.1(e)(5). In addition, this
promotional communication was not submitted at the time of initial dissemination or
publication as required by 21 CFR 314.81(b)(3)(i). These violations are concerning from a
public health perspective because this promotional communication creates a misleading
impression about the safety of Paragard.

100.    Yet again, Plaintiff's concerns were validated by the FDA.

101.    Following issuance of the letter, Plaintiff privately mentioned to Defendant
Tavener that she had flagged her concerns about this promotional activity during the status call
with the public relations agency.

102.    Defendant Tavener did not respond positively to the reminder, claimed not to
remember it, and immediately dismissed Plaintiff.

## VII.   Defendants' Retaliation Against Plaintiff Began in Earnest Following Plaintiff's Whistleblowing on the PR Activity.

103.    Plaintiff received positive performance reviews, i.e., an overall rating of "Meets
Expectations" or higher, from four supervisors across Teva and Defendant CooperSurgical over

19

four and one-half years of review cycles prior to Defendant Tavener's first review of Plaintiff in November 2020.

104.    Specifically, in her review for 2016, Plaintiff's supervisor at Teva noted:

> The two Teva Values that come to mind when considering Carolyn is "Caring" and "Leading the Way." I am very much impressed with Carolyn's commitment, passion, and attention to detail. She seeks to create a high quality product or experience in all that she is involved. Here are some of the quotes from those that worked with her this year:
> *"Carolyn is great to work with and always willing to lend a hand even when she is stretched thin. She can handle an amazing amount of work and is always looking to make things the best that they can be. She also is wonderful as a field liaison and is able to take their recommendations and interpret the overall need without running on every little request that comes through."*
>
> *"Carolyn's dedication and passion to WH and Teva is evident in her work and the long, long hours she puts in. It is not unusual to receive emails from Carolyn late in the evening and on weekends. She has great insight into the Paragard business and has the ability to provide what the sales team needs."*
>
> *"Carolyn is thorough, detail oriented and responsive."*
>
> *"Carolyn is extremely organized, amazing attention to detail and takes pride in all the works that she does for Teva Women's Health. Her organization and follow up skills are second to done and is mindful to complete her projects on time. She has spearheaded on some amazing projects such as the Paragard display models which were shown at our August Manager's Meeting. The response was overwhelming and a resounding success from field sales and HCP offices."*
>
> *"Carolyn is HIGHLY detail-oriented and takes pride in everything she is responsible for. She is relentless in her commitment to make everything the best it possibly can be. She understands timing implications of her feedback in the overall process of the workflow. She is extremely responsive, even when she's very busy. There has been great feedback from the sales force and her peers about the initiatives that she has delivered on. She makes promises and keeps them, no matter what it takes. Her dedication is commendable."*

105.    In her mid-year review for 2017, a different supervisor of Plaintiff at Teva noted:

> Carolyn is on track to meet her 2017 performance goals, which was slightly modified during the mid-year based on Paragard brand lead transition. She has made solid contribution in driving Paragard performance during the first half of the year. Carolyn is making good progress on her IDP goals. She has demonstrated resilience, positive attitude, and strong leadership despite significant changes to the Women's Health business unit since the beginning of the year. Based on our mid-year dialogue, I am confident that Carolyn has all the support and resources to finish the year successfully.

106.    In addition, Plaintiff received awards from Teva for team leadership and outstanding contributions.

107.    In June 2018, Plaintiff received a positive mid-year review that was completed by her first manager at CooperSurgical, who noted:

> **MANAGER'S COMMENTS:**
> Carolyn has been a terrific addition to CooperSurgical. Other than an admin, Carolyn was the only marketing person to come over from Teva and so all the tactical work fell on her initially. She came with great knowledge of the research previously completed on Paragard and helped us utilize those learnings into improving our positioning and approach to the market. She drove the need to refine the positioning; drove FCB to have better creative and drove the work to get done in the extremely short timeframe we were given. She had three months after acquisition to make all the new materials for the sales force. She is extremely well organized and a very hard and smart worker. She communicates well both up and down in the organization and is well liked by all which results in people wanting to follow her. She intuitively knows where to focus her efforts for the best return which is a very important talent in marketing. When we have Paragard sales success this year, Carolyn needs to be given credit for the vast contribution she made towards that success. Without her dedication, our sales force would have entered the market without the needed materials for success. We can't discount the improved metrics we have seen in web hits which are likely being driven by advertising which Carolyn drove to be the best it could be. I believe Carolyn can learn from her current supervisor's many years of experience in pharma marketing and with mentoring, can one day be the director of the brand.

108.    In November 2018, Plaintiff received her annual evaluation from her second manager at Defendant CooperSurgical for 2018 in which she was rated "CONSISTENTLY EXCELLENT" in 18 of 19 categories and "FULLY MEETS STANDARDS" in the remaining category. The only other rating option was "OPPORTUNITY FOR IMPROVEMENT," and Plaintiff did not receive that rating in any category. In the narrative portion, Plaintiff's supervisor said:

> **MANAGER COMMENTS (END OF YEAR):** I agree. Carolyn's contributions as Direct to Consumer leader for Paragard are immense and will be a main reason that Paragard will succeed as it relaunches into the marketplace this year. I am very impressed and pleased with her contributions and look forward to continued strong consumer leadership from her as we continue to roll out all our Paragard initiatives over the coming months. As our third team member is hired for Paragard, I will be looking for Carolyn to be contributing at an even more strategic level.

109.    In November 2019, Plaintiff received her annual evaluation for 2019. Plaintiff's supervisor rated Plaintiff "Meets Expectations" overall:

### Overall Evaluation

|  | Worker | Manager |
|---|---|---|
| Overall Rating | Exceeds Expectations | Meets Expectations |
| Comments | I believe my efforts throughout the year have shown that I always put 110% into the wide variety of work that is on my plate. I oversee a large number of agency partners and significant amount of spend and always strive to do what is best for the brand to ensure Paragard growth for years to come. | You have led a strong effort for the significant Consumer side campaign for Paragard this year. The campaign along with Sales pull through drove 11% growth in demand sales, for the first time in the brand's history. You should be proud of this accomplishment. The comprehensive efforts intertwined to drive the consumer into offices to "insist on Paragard" based on the tactical execution of the consumer campaign. Everything came together to set Paragard on a comprehensive growth path which we will continue to build on in Year 2 of our efforts at CooperSurgical. |

110.    In November 2020, one month after Plaintiff confronted Defendant Tavener about the violative public relations activity, Defendant Tavener gave Plaintiff an "Overall Rating" of "Meets Expectations."

111.    In direct retaliation for the complaints Plaintiff had raised, and in an attempt to discredit Plaintiff's character, in this review, Defendant Tavener rated Plaintiff "Partially Meets Expectations" on the Core Values of "Ethical," "Passionate," and "Respectful."

112.    Plaintiff immediately contacted Defendant Boyle, Director, Human Resources, to relay her belief that the review was unfair and in retaliation for Plaintiff's defiance of Defendant Tavener's instruction to turn a blind eye to the FDCA and regulations promulgated thereunder that govern Defendant CooperSurgical's public relations activity and Plaintiffs continued complaints that Defendants hire knowledgeable regulatory and compliance staff to carry out all of Defendant CooperSurgical's pharmaceutical regulatory obligations.

113.    Defendant Boyle told Plaintiff she was "***being sensitive to feedback***" and that she "***need[ed] to learn how to take the feedback that's being provided***."

114.    On April 19, 2021, a mere two months after Defendant CooperSurgical received the Warning Letter, Defendant Tavener invited Plaintiff to lunch in Cherry Hill, New Jersey, to "catch up."

115.    Plaintiff believed Defendant Tavener invited her to lunch to thank her for handling the very heavy workload that she had been managing because Plaintiff had just completed a significant, nearly year-long project preparing the launch of Defendant CooperSurgical's new eight-media-channel consumer campaign.

116.    Quite to Plaintiff's surprise, however, after Defendant Tavener made small talk for more than 30 minutes, she handed Plaintiff a written Employee Warning Notice.

117.    The Employee Warning Notice contained numerous untrue and defamatory statements about Plaintiff's character and work performance as well as unsubstantiated claim that this was Plaintiff's "third warning."

118.    Plaintiff attempted to discuss the untrue and defamatory statements with Defendant Tavener, but she immediately dismissed everything Plaintiff said.

119.    Plaintiff reached out to Defendant Boyle the same day—April 19, 2021—to report the incident.

120.    Plaintiff and Defendant Boyle spoke on April 19, 2021.

121.    During that conversation, Plaintiff informed Defendant Boyle that the Employee Warning Notice was unjustified, unfair, and retaliatory.

122.    Plaintiff once again attempted to defend herself against the untrue and defamatory statements that threatened her employment.

23

123.    Defendant Boyle responded that "*the warning letter was not serious*" and the "the warning letter was a tool being used as guidance and coaching for [Plaintiff] in [her] career growth."

124.    Defendant Boyle also advised Plaintiff "to take the guidance being provided to [her] from [her] manager."

125.    Plaintiff recapped the conversation with a written email to Defendant Boyle.

126.    In May 2021, Defendant Tavener told Plaintiff that senior management had decided to change the direction of the new consumer campaign Plaintiff had been working on for almost one year.

127.    Specifically, senior management decided to pre-clear the campaign with the FDA and directed that the entire campaign, including between 50-75 collateral assets be redone.

128.    In May 2021, Defendant Tavener assigned Plaintiff an incremental job responsibility and workload of being the Internal Sales Team Marketing Liaison, following the positive feedback from this team on Plaintiff's attendance at their National Sales Meeting.

129.    In or around July 2021, Plaintiff received a communications hold notice in connection with a personal injury lawsuit against Defendant CooperSurgical involving allegations of failure to warn, design defect, manufacturing defect, breach of warranty, negligent misrepresentation, and violation of consumer protection laws related to PARAGARD®.

130.    On or about October 6, 2021, Plaintiff was invited to a business planning meeting with leadership of Defendant CooperSurgical and its advertising agencies.

131.    The meeting host communicated in advance of the meeting that all attendees would be required to take a COVID test, but no vaccination was required.

132.    However, the day before the event, Defendant Tavener advised Plaintiff that she was no longer invited because Defendant Tavener informed the meeting host of her protected health information.

133.    Plaintiff had not authorized Defendant Tavener to disclose Plaintiff's health information, and she expressed her concern with Defendant Tavener, who responded, "sorry" but "they are worried you will get everyone sick."

134.    In or around November 2021, Plaintiff received her review for 2021. In further retaliation, Defendant Tavener gave Plaintiff an "Overall Rating" of "Meets Expectations" and once again rated Plaintiff "Partially Meets Expectations" on the Core Values of "Passionate" and "Respectful."

135.    Amazingly, Defendant Tavener rated Plaintiff "Partially Meets Expectations" on "Respectful" in connection with Plaintiff's challenge of Defendant Tavener's untrue and defamatory statements about Plaintiff's performance:

| Performance Rating | Exceeds Expectations | Partially Meets Expectations |
|---|---|---|
| Comments | I strive to show accountability and collaboration with my internal and external team on a daily basis. After receiving feedback from my manager, I've made a concerted effort to be on time and present during all meetings. I've also made an effort to improve my partnership with others by being more concise and direct when providing direction or giving feedback. | Carolyn was reluctant to accept accountability when she was discussing performance shortfalls and was disrespectful to her manager. She is working on effectively partnering with internal and external colleagues. I believe she wants to be a great business partner and has made strides. Continue to focus on generating synergy and positively influencing others. |

136.    In or around May 2022, Plaintiff was asked to prepare the marketing presentation and present live on stage at the National Sales Meeting in Phoenix, Arizona.

137.    Following her presentation, Plaintiff was contacted by the Global Human Resources Director of CooperSurgical, who gave her accolades on her presentation and work.

138.    The Global Human Resources Director also asked Plaintiff if she was interested in being featured on a company coffee talk and if she could help with recruitment efforts for the business unit.

139.    Plaintiff mentioned the outreach to Defendant Tavener, who responded that Plaintiff should "*stop engaging with HR*" and that "*all HR interactions should go through her*."

140.    In or around July 2022, Defendant Tavener assigned Plaintiff another incremental job responsibility of being the marketing planning lead on a large project that involved extensive planning for a new product launch.

141.    Following completion, the launch project manager publicly thanked Plaintiff for being the most diligent and prepared of all cross-functional departments.

142.    After Plaintiff completed her work, including the incremental job assignments and attending a significant number of incremental development trainings, Plaintiff orally received a negative mid-year review in July 2022.

143.    Plaintiff asked Defendant Tavener for specifics and Defendant Tavener responded with things that were not true and identified tasks within Plaintiff's understood job description as things she should not be doing.

144.    Defendant Tavener refused to provide examples.

145.    Plaintiff contacted Defendant Boyle who directed Plaintiff to have a conversation with Defendant Tavener about why Plaintiff would not be qualified to receive a positive review or promoted job title after completing five years of service with the company, a significant amount

of her assigned work, as well as the numerous incremental projects and responsibilities Defendant Tavener continued to assign her.

146. Plaintiff attempted to have this conversation, but Defendant Tavener only yells at her.

147. On or about July 27, 2022, Plaintiff again contacted Defendant Boyle to inform her that Defendant Tavener was making untrue statements about her and that it was impugning Plaintiff's reputation and was harmful to her employment.

148. Plaintiff also informed Defendant Boyle that Defendant Tavener is treating her unfairly and that she believes it is in retaliation for repeatedly standing up for herself in defiance of Defendant Tavener's unfair treatment and reporting the numerous regulatory failures of Defendant CooperSurgical and Defendant Tavener.

149. Defendant Boyle responded, "*I can file an investigation, but more than likely it won't go in your favor.*"

150. Believing the investigation would amount to a sham, Plaintiff decided not to pursue the matter at that time.

151. On September 8, 2022, Defendant Tavener's supervisor, Defendant Gates, Vice-President, Sales and Marketing, set time on Plaintiff's calendar to discuss Plaintiff's request for a promotion to the Associate Director title.

152. During the meeting, Defendant Gates told Plaintiff that she was "*making more money than many directors here.*"

153. Defendant Gates also informed Plaintiff that she is the one who must put in the request for Plaintiff's promotion because she oversees promotions.

154. Defendant Gates asked Plaintiff if she is happy at the company.

155.    Plaintiff responded that she liked her job but reiterated her concerns with Defendant Tavener's retaliatory conduct.

156.    Defendant Gates responded, "I want to make sure you're happy," and she agreed to "get back to [Plaintiff]."

157.    Plaintiff never heard from Defendant Gates on the matter again.

158.    On or about November 11, 2022, Plaintiff received her review for 2022.

159.    For the first time in her seven years with Teva and Defendant CooperSurgical, Plaintiff received an "Overall Rating" of "Partially Meets Expectations." The review was clear retaliation for Plaintiff engaging in whistleblower conduct.

160.    Defendant Tavener and Defendant Boyle delivered the review and informed Plaintiff she was being put on a six-month Performance Improvement Plan because she is "*demoralizing and dismissive to others*."

161.    As Plaintiff previously suspected, Defendant Tavener and Defendant Boyle conspired to gin-up false allegations to set up Plaintiff's unlawful, pretextual retaliation.

162.    When Plaintiff disputes this accusation, Defendant Tavener told her that she received emails from internal and external colleagues who do not like to work with Plaintiff.

163.    Defendant Tavener did not provide these emails to Plaintiff.

164.    In addition, Plaintiff was unaware of any such feelings because her relationships were all in good standing.

165.    Following her review meeting, Plaintiff had a separate meeting with Defendant Boyle to reiterate her concern that she is being retaliated against by Defendant Tavener.

166.    Defendant Boyle asked Plaintiff to "take the weekend to think about it," and suggested that she "can looking into seeking if [she] can get a few weeks of severance for

[Plaintiff] if she just wants to leave now." Defendant Boyle's comments only confirmed Plaintiff's suspicions.

167.    Plaintiff declined the invitation to leave her employment and asked Defendant Boyle to start a formal investigation into the treatment Plaintiff has been subjected to.

168.    On or about November 12, 2022, Plaintiff emailed Defendant Boyle to request an in-person meeting to discuss these issues further.

169.    Plaintiff received an out-of-office message from Defendant Boyle.

170.    Plaintiff forwarded her request to Defendant Boyle's manager.

171.    Plaintiff subsequently had a meeting with Defendant Boyle.

172.    Defendant Boyle told Plaintiff she would initiate an internal investigation that would be conducted by an unbiased corporate attorney from the parent company, Cooper Companies.

173.    On or about November 17, 2022, Defendant Kolcon, Senior Counsel, Director of Labor Law & Litigation, at Cooper Companies contacted Plaintiff.

174.    Plaintiff provided Defendant Kolcon a timeline of events.

175.    Defendant Kolcon instructed Plaintiff to cease contact with her manager, Defendant Tavener.

176.    Defendant Kolcon informed Plaintiff that Defendant Gates (Defendant Tavener's manager) would supervise her work for the duration of the internal, sham investigation.

177.    The same day, Plaintiff reached out Defendant Gates to discuss workflow and reporting, and Plaintiff sends Defendant Gates weekly project updates as directed.

178.    Defendant Gates never scheduled time to meet with Plaintiff and never asked anything of Plaintiff during this time.

179.   On or about November 30, 2022, Plaintiff made a presentation during a previously scheduled National Sales Meeting conference call.

180.   The presentation was successful, and Defendant Gates thanked Plaintiff during the call for the work she presented as well as for Plaintiff's tremendous efforts throughout the year.

181.   On or about December 1, 2022, Plaintiff had a meeting with the internal sales team during which one of the sales representatives asked about promoting PARAGARD® to the pediatric population ages 12+.

182.   Plaintiff was immediately concerned because although the FDA-approved package insert for PARAGARD® indicates it for pregnancy prevention in females of reproductive age, and some females may medically qualify for this at age 12, Plaintiff felt there may be legal and moral implications to promoting to an audience this young. Specifically, Plaintiff voiced that 12 years old may not qualify for the age of sexual consent in certain states and therefore a decision to promote to this demographic should be a larger discussion with the marketing team and legal counsel.

183.   Nevertheless, Defendant Tavener did not voice that she agreed with the Plaintiff's concerns on the call.

184.   Following the meeting, Plaintiff engaged in protected conduct and reported her concerns to Defendant Gates. Plaintiff asked for clarity on how to respond to the question whether it was appropriate to promote PARAGARD® to the 12+ population given PARAGARD®'s approved indications in combination with state laws.

185.   On December 9, 2022, Defendant Gates and Plaintiff met to discuss this issue.

186.    During that meeting, Defendant Gates informed Plaintiff that she spoke with others who were on the December 1, 2022 call and "no one recalled hearing anything about a 12+ audience."

187.    Defendant Gates used a very accusatory tone and acted as if she was attempting to catch Plaintiff in a lie.

188.    Plaintiff, however, informed Defendant Gates that the subject was definitely brought up and she just wanted to know how to respond to the issue.

189.    Defendant Gates confirmed the company would never promote to a population that young.

190.    On or about December 14, 2022, Plaintiff, Defendant Tavener, and Defendant Gates attended another call with the sales representative advertising board during which the same sales representative brought up the issue of promoting to the 12+ population.

191.    Neither Defendant Tavener nor Defendant Gates said anything in response to the sales representative's idea of promoting to the 12+ population.

192.    On or about December 15, 2022, Defendant Kolcon contacted Plaintiff to share that the investigation had concluded. Defendant Kolcon informed Plaintiff that the sham investigation did not reveal any wrongdoing by Defendant Tavener.

193.    Defendant Kolcon also said, "there is no denying you're a very hard worker and have been handed and completed a significant amount of work," "the company values you and just wants you to grow in the areas your manager outline to be a better leader."

194.    Defendant Kolcon also reassured Plaintiff, "*you are absolutely not being fired*," and tells her she "*cannot face any retribution for filing this investigation.*"

195.    As a result of the investigation, Defendant Kolcon recommended to Defendant Tavener and Defendant Gates that Plaintiff be provided with a job description so there are no discrepancies on what is and is not within the scope of Plaintiff's job.

196.    Finally, Defendant Kolcon informed Plaintiff that Defendant Gates will be in touch with her to transition her supervision back to Defendant Tavener.

197.    On or about December 15, 2022, Defendant Gates informed Plaintiff that she would set up a meeting during the first week of 2023 to transition the supervision of Plaintiff's work back to Defendant Tavener.

198.    Plaintiff took two weeks of prior-approved paid time off from December 19, 2022, through January 2, 2023.

199.    Plaintiff returned on January 2, 2023.

200.    Plaintiff continued to perform her tasks and attend all scheduled meetings.

201.    Neither Defendant Gates nor Defendant Tavener reached out to her.

## VIII.    Three Weeks After the Investigation of Plaintiff's Complaints Is Concluded (and Plaintiff Was Out of the Office for Two of Those Weeks), and Contrary to Representations from Each and Every Individual Defendant, Plaintiff Was Terminated

202.    On or about January 6, 2023, Defendant Gates scheduled time on Plaintiff's calendar for 4:55 pm.

203.    When Plaintiff joined the call, Defendant Gates and Defendant Boyle were waiting. Therein, Defendant Gates and Defendant Boyle informed Plaintiff of her termination for "poor performance."

204.    Plaintiff responded that this is entirely inconsistent with her discussion with Defendant Kolcon at the conclusion of the internal investigation, entirely inconsistent with being

32

provided a job description, and entirely inconsistent with the six-month performance improvement plan she was told she would be put on during her review in November 2022.

205.    This action also was inconsistent with Plaintiff's 2023 Compensation Statement, effective January 1, 2023, which reported that Plaintiff had been "award[ed]" a 2% merit increase "[a]s a result of your 2022 performance." The 2023 Compensation Statement also reported that Plaintiff had earned a bonus based on the financial performance of the company and her own personal achievements.

206.    The response Plaintiff received was, "*The decision has been made*."

207.    Defendants' justification for Plaintiff's termination is clearly pretext, as Defendants terminated Plaintiff in blatant retaliation for her repeated complaints.

208.    As a result of Defendants unlawful conduct, Plaintiff suffered and continues to suffer significant financial harm.

209.    Individual Defendants aided, abetted, incited, compelled, and/or coerced and/or attempted to aid, abet, incite, compel, and/or coerce each other and/or Corporate Defendants to commit acts and omissions that were in violation of the CEPA by committing affirmatively retaliatory acts toward Plaintiff, rendering each of them individually and collectively liable under CEPA.

210.    On or about January 13, 2023, Plaintiff had a follow-up call with Defendant Boyle during which Plaintiff asked why she was not offered severance. Defendant Boyle responded that the company does not offer severance for terminations related to poor performance.

211.    In addition, despite being told at the time of her termination that she would receive the bonus she earned based on the company's and her 2022 performance, the bonus was not paid as scheduled.

## COUNT ONE

## RETALIATION IN VIOLATION OF NEW JERSEY
## CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")

212. Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

213. CEPA's legislative purpose "is to protect and encourage employees to report illegal or unethical workplace activities and to discourage . . . employers from engaging in such conduct." *Lippman v. Ethicon, Inc.*, 222 N.J. 362, 378 (2015) (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 431 (1994)).

214. CEPA specifically provides:

> *An employer shall not take any retaliatory action against an employee because the employee does any of the following*:
>
> a. *Discloses*, or threatens to disclose *to a supervisor or to a public body an activity, policy or practice of the employer*, or another employer, with whom there is a business relationship, *that the employee reasonably believes*:
>
> (1) *is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any* shareholder, investor, *client, patient, customer*, employee, former employee, retiree or pensioner of the employer *or any governmental entity*, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or
>
> (2) *is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any* shareholder, investor, *client, patient, customer*, employee, former employee, retiree or pensioner of the employer *or any governmental entity*;
>
> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving

34

deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or

c. *Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes*:

(1) *is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any* shareholder, investor, *client, patient, customer*, employee, former employee, retiree or pensioner of the employer *or any governmental entity*, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2) *is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any* shareholder, investor, *client, patient, customer*, employee, former employee, retiree or pensioner of the employer *or any governmental entity*; or

(3) *is incompatible with a clear mandate of public policy concerning the public health, safety or welfare* or protection of the environment.

N.J.S.A. 34:19-3 (emphases added).

215.    In the course of her employment with Defendant CooperSurgical, Plaintiff reasonably believed that Defendant CooperSurgical's practices as the manufacturers of PARAGARD® constituted a "violation of a law, or a rule or regulation promulgated pursuant to law." N.J.S.A. 34:19-3(a)(1), (c)(1). Further, Plaintiff reasonably believed Defendants unlawfully engaged in deception and misrepresentations to clients and governmental entities, namely the FDA.

216.   Furthermore, Plaintiff reasonably believed Defendants' practices were incompatible with clear mandates public policy concerning the public health, safety or welfare. N.J.S.A. 34:19-3(c)(3).

217.   The conduct that Plaintiff repeatedly complained of was conduct that Plaintiff reasonably believed was in violation of laws and regulations including, but not limited to: the Sunshine Act"), 42 U.S.C. § 1320a-7h; the FDCA, 21 U.S.C. §§ 301-399; and FDA regulations that require postmarketing reporting of adverse drug experiences, 21 C.F.R. 314.80; 21 C.F.R. 314.80(c)(1)(i); 21 C.F.R. 314.80(c)(1)(ii); 21 U.S.C. §§ 321(k), 321(m), 331(a), 352(a).

218.   Plaintiff complained, objected to, and refused to participate in these activities commissioned by Defendants.

219.   Defendants had knowledge of Plaintiff's complaints, objections, protests, and/or ultimate refusal to participate further in Defendants' unlawful activities and practices.

220.   As a direct result of Plaintiff raising complaints, objections, protests, and/or her refusal to further participate in Defendants' unlawful activities and practices, Defendants took retaliatory action against Plaintiff by taking adverse employment actions against Plaintiff, culminating in her termination.

221.   Defendants' explanations for terminating Plaintiff's employment are pretextual.

222.   Defendants are vicariously, strictly, and/or directly liable to Plaintiff for taking an adverse employment action against Plaintiff in violation of CEPA, N.J.S.A. 34:19-1, *et seq.*

223.   CEPA imposes liability to Individual Defendants who engage in retaliatory and unlawful conduct, irrespective of their supervisory role.

224.   Plaintiff and Defendant Tavener worked from their home-office in New Jersey.

36

225.    Plaintiff's complaints, Defendant's unlawful conduct, and Plaintiff's terminations have a significant relationship to New Jersey.

226.    Defendants unlawful conduct and practices posed a public harm to residents of New Jersey.

227.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under CEPA, punitive damages, pre-and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just.

## COUNT TWO

## WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

228.    Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

229.    As set forth herein, Plaintiff reported to her supervisors, human resources, and even the legal department, that the practices of Corporate Defendants violated federal statutory and regulatory laws.

230.    Defendants had knowledge of Plaintiff's complaints and objections.

231.    The acts of Defendants constitute a wrongful discharge in violation of public policy by which Plaintiff has been damaged and will continue to suffer damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the law, punitive damages, pre-and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just.

## DEMAND FOR DISCOVERY OF INSURANCE COVERAGE

Pursuant to *Rule* 4:10-2(b), demand is made that Defendants disclose to Plaintiff's attorney whether or not there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all the judgment which may be entered in this action or indemnify or reimburse for payments made to satisfy the judgement and provide Plaintiff's attorney with true copies of those insurance agreements or policies, including, but not limited to, any and all declaration sheets. This demand shall include and cover not only primary insurance coverage, but also any excess, catastrophe, and umbrella policies.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

McOMBER McOMBER & LUBER, P.C.
*Attorneys for Plaintiff Carolyn Paolucci*

By: */s/ Matthew A. Luber*
Matthew A. Luber, Esq.

Dated: June 26, 2023

## DESIGNATION OF TRIAL COUNSEL

Pursuant to *Rule* 4:25-4, MATTHEW A. LUBER, ESQUIRE, is hereby designated as trial counsel for Plaintiff.

## CERTIFICATION

Pursuant to *Rule* 4:5-1, it is hereby certified that, to the best of my knowledge, there are no other civil actions or arbitration proceedings involving this matter with respect to this matter and no other parties need to be joined at this time. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

McOMBER McOMBER & LUBER, P.C.
*Attorneys for Plaintiff Carolyn Paolucci*

By: /s/ Matthew A. Luber
      Matthew A. Luber, Esq.

Dated: June 26, 2023