# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA ATLANTA DIVISION

| | |
|---|---|
| IN RE: PARAGARD IUD PRODUCTS LIABILITY LITIGATION | ) **MDL DOCKET NO. 2974** <br> ) <br> ) **(1:20-md-2974-LMM)** <br> ) <br> ) **This Document Relates to the Following** <br> ) **Cases:** <br> ) **Alisa Robere (1:22-cv-01583)** <br> ) **Melody Braxton (1:22-cv-00490)** <br> ) **Pauline Rickard (1:21-cv-03861)** |

## TEVA'S NON-RETAINED EXPERT DISCLOSURES

Defendants Teva Pharmaceuticals USA, Inc., Teva Women's Health, LLC, and Teva Branded Pharmaceutical Products R&D, Inc. (collectively, "Teva"), pursuant to Federal Rule of Civil Procedure 26(a)(2)(c), provide the following written disclosures for these non-retained expert witnesses:

1. David Bonilla

2. Joseph De Vito, PharmD

3. Brandi Howard, NP, PhD

4. Thomas Mehs

5. Angela Randall

6. Erin Rose

7. Hedva Voliovitch, MD, PhD, MBA

8.  Healthcare Providers

## 1.  David Bonilla

David Bonilla will provide testimony and opinions consistent with his education, training, personal knowledge, and experience as a decades-long pharmaceutical quality management professional and manager and a licensed pharmacist, and with the deposition testimony he has already given in litigation, concerning Teva's Quality Management System ("QMS").

Bonilla received his Bachelor of Science in Biology from Kansas State University ("KSU"). He also performed graduate studies in Microbiology at KSU and in QA/RA Product Development at Temple University in Pennsylvania.

From 1993 to 2010, Bonilla was employed by McNeil Consumer Healthcare ("McNeil"). For the first three years, he was a microbiologist located in Puerto Rico. He was promoted to supervisor of Quality Control ("QC") and Research & Development ("R&D") Microbiology in 1996, where he supervised fifteen microbiologists and managed the testing and release of product and raw materials. His responsibilities included providing cGMP training for manufacturing, quality, and laboratory personnel; auditing local and contract manufacturing facilities to meet compliance requirements; writing and approving Out-of-Specification ("OOS") investigations; authoring validation protocols; and preparing Annual Product Review reports. In 2000, he was promoted again to Quality Assurance

Manager, QC / R&D Microbiology. In that role, he supervised staff in all aspects related to Quality and the Microbiology Laboratory for the testing and release of raw materials and solid and liquid pharmaceutical and over-the-counter products. He also served as the subject matter expert in microbiology and interacted with FDA and other regulatory agencies. His responsibilities included implementing a change control program for his site, developing an internal audit program, and supervising the product complaints program. In 2006, McNeil's parent company Johnson & Johnson acquired Pfizer PHC (Pharmaceutical Healthcare) Division, and Bonilla was selected to work on the integration and establishment of harmonized practices and processes. His responsibilities in this role included working with a cross functional team consisting of Quality and Operations to design and implement harmonized policies related to testing and releasing of products and providing consistency and uniform practices across sites.

Between 2010 and 2012, Bonilla served as Director QA/QC Americas for Colorcon, Inc., in Pennsylvania. He was hired to increase compliance with regulations and customer expectations from a quality perspective. He was responsible for the Quality Assurance ("QA") and Quality Control ("QC") of the manufacturing of pharmaceutical excipients for the Americas. He managed a team of 50 quality professionals and assured compliance with applicable internal and external regulations, standards, policies, and procedures related to quality. He

provided strategic leadership of quality systems for the Americas, like corrective and preventative action ("CAPA"), investigation/deviation, non-conformances review and approval, product release, document control, and complaint handling programs. He was responsible for the oversight of the external contract manufacturing site that process the intermediate steps of some of the company's products. He collaborated with the Operations team to establish a culture of higher compliance with regulations across the company.

Between 2013 and 2015, he served as Head of Quality, Lewes and New Castle, at SPI Pharma, Delaware. He was again hired to increase the compliance with regulations and customer expectations from a quality perspective. He was responsible for QA and QC of the manufacturing of active pharmaceutical ingredients and excipients. He assured compliance with global regulations and guidelines. He coached and educated staff at multiple sites on the interpretation of the GMP regulations and how to implement them. He was also responsible for the revamping of staffing in order to get the work done in a compliant manner.

In 2015, Bonilla joined Teva as Associate Director, Quality Assurance Services and Compliance. He was hired to manage the extensive USA product quality complaint ("PQC") process, which was expanding due to a growing product portfolio and the launch of innovative products. He was responsible for the PQC Intake Center and the Closing Team. He assured compliance with FDA regulations.

He managed a team of sixteen professionals across the United States and India. In 2017, after Teva acquired Actavis Pharmaceuticals, his title changed to Associate Director, Commercial Quality and Compliance. He took on additional responsibilities, including the management of field alert reports and recalls, reporting product drug shortage to FDA, management of the Teva Learning Management Systems, and more. In 2021, after the Paragard New Drug Application ("NDA") was sold to CooperSurgical, Inc., Bonilla was promoted to Director Commercial Quality North America, where his responsibilities expanded to include Canada. Bonilla left Teva in 2025.

Bonilla is expected to provide his contemporaneous opinion that Teva's QMS as it related to Paragard was adequate and appropriate. He is expected to explain what a QMS in a pharmaceutical company does and why. This includes providing explanations regarding the various departments, teams, functions, policies, procedures, technologies, and other checks and balances employed by pharmaceutical companies as part of their QMS. This also includes explaining the different QA processes throughout the life cycle of a product, including before, during, and after manufacturing and sale of the product. This also includes explaining NDAs, Drug Master Files, and various other standard documents and forms that collectively provide the FDA-approved manufacturing specifications for a pharmaceutical product. He may also explain what current Good Manufacturing

Practices ("cGMP") are and how they are enforced within pharmaceutical companies. He is expected to testify that Teva met and exceeded industry standards and regulations with respect to each of these elements of a QMS.

With respect to PQCs, Bonilla is expected to explain what PQCs are, how they compare with adverse event reports, where they come from, and what standards and regulations apply to their intake, investigation, processing, reporting to authorities, and closure. He is expected to testify about how PQCs are analyzed to determine statistically significant trends. He is expected to testify that Teva satisfied applicable standards and regulations pertaining to capturing and processing all PQCs. He is expected to testify that the methods and technologies, such as the Trackwise system, used by Teva to process Paragard PQCs were valid. He is expected to testify that Teva's quality team members performed adequate and appropriate investigations of Paragard PQCs, including proper visual examinations of return samples, testing on "retained" samples from the lot in question, and batch record review. He is expected to testify that Teva appropriately analyzed PQC data for potential trends related to Paragard. He is expected to testify that Teva provided the FDA timely and appropriate quality-related notices or communications about Paragard. He is expected to testify that all individuals working on PQCs for Paragard were sufficiently qualified. He is expected to testify that Teva's processing of PCQs

ensured that potential evidence of deviations from Paragard's approved manufacturing specifications would be properly captured.

Bonilla is expected to testify that Teva was subject to periodic FDA inspections and oversight, and that, in his contemporaneous opinion, Teva adequately and appropriately responded to all FDA demands during and after inspections. He may explain the purpose and expectations of FDA inspections of pharmaceutical companies, the meaning and effect of "observations" in 483 letters and Establishment Inspection Reports, and the potential enforcement mechanisms the FDA could use against pharmaceutical companies that are not performing adequately or appropriately. He is expected to testify that the FDA never ordered Teva to remove Paragard from the market or took any enforcement action against Teva with regard to any quality or safety issues.

Bonilla is expected to provide his contemporaneous opinion that Teva initiated and executed CAPA plans related to Paragard in an appropriate manner. He may explain what CAPAs are in the pharmaceutical industry and how they are initiated, tracked, and managed. He is expected to testify that Teva had the proper technology and procedures in place to ensure its CAPA practices followed standards and regulations.

Finally, Bonilla may provide contemporaneous expert opinion about any documents pertaining to the quality management of Paragard or any other topic on

which he has been identified as Teva's corporate witness. His opinions are based solely on his education, training, knowledge, experience, and responsibilities as a quality professional and licensed pharmacist. He has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

### 2. Joseph De Vito, PharmD

Joseph De Vito will provide testimony and opinions consistent with his education, training, personal knowledge, and experience as a decades-long pharmaceutical quality management professional and manager and a licensed pharmacist, and with the deposition testimony he has already given in litigation, concerning Teva's QMS and the materials and design of the Paragard IUD.

De Vito received his Bachelor of Science in Pharmacy from Albany College of Pharmacy in New York in 1982. He received his Doctor of Pharmacy from Medical University of South Carolina, College of Pharmacy, in 1984. He did a research fellowship in pharmacokinetics at the Clinical Pharmacokinetics Lab at Millard Fillmore Hospital, State University of New York, from 1984 to 1985.

Since June 1985 to present, De Vito has been continuously employed by several pharmaceutical companies in quality management, pharmaceutical research and development, and other roles. From 1986 to 1999, he was employed at Lederle Laboratories, a division of American Cyanamid. As its Assistant Director and later Associate Director of Professional Medical Services, he was responsible for

pharmacokinetic drug studies for product line extensions, new product indications, and Phase IV (post-marketing or post-approval) commitments. As Department Head of Pharmacology and Scientific Services, he was responsible for drug study work, investigation of complaints on all products, and bioequivalence studies. As Director, Executive Director, and Assistant Vice President of Solids, Research and Development, he was responsible for drug development and FDA approval for over twenty products.

From 1999 to 2012, he served Wyeth Pharmaceuticals and, after an acquisition, Pfizer. As Wyeth's Assistant Vice President of Quality Operations for US Solids and Liquids, De Vito was responsible for quality operations of the manufacturing sites in North America, Puerto Rico, and Canada. In this role, site quality heads reported to De Vito. He oversaw quality and compliance operations, organizational development, and execution of product supply chain activities. As Vice President of Quality for Wyeth and Pfizer, he was responsible for overseeing quality assurance of these products, leading Quality Product Leaders, field compliance auditing and programs, and quality review and support for global regulatory filings.

De Vito joined Teva in July 2012 as Vice President of Quality. Until October 2016, he was responsible for quality operations of pharmaceutical manufacturing sites in North America including the Buffalo site where Paragard was manufactured.

Site heads of quality reported to him. He oversaw management reviews and quality councils, organizational development, and continuous improvement and execution of product supply activities. From November 2016 to July 2019, as Senior Director of Global Quality, Compliance, Quality Systems and Compliance, he led the quality systems and compliance organization, which is responsible for complaint management in the US, trending and reporting of global complaints, recalls, field alerts, and quality systems development and implementation. Teva's QMS includes policies, corporate standards, SOPs, and corporate guidance. From August 2019 to present, as Senior Director of Global Quality, Audits and Compliance, he has been responsible for, among other things, the Global Risk Assessment Program, Vendor Audit Program, Mock Inspections program, and Due Diligence Audits. He provides strategic leadership and direction to the Global Quality audit program to ensure compliance with Teva's QMS and regulations across the Teva manufacturing network and its suppliers. He leads the Compliance Council which evaluates Health Authority Observations for trends that impact the manufacturing network.

De Vito is expected to provide his contemporaneous opinion that Teva's QMS as it related to Paragard was adequate and appropriate. He is expected to explain what a QMS in a pharmaceutical company does and why. This includes providing explanations regarding the various departments, teams, functions, policies, procedures, technologies, and other checks and balances employed by

pharmaceutical companies as part of their QMS. This also includes explaining the different QA processes throughout the life cycle of a product, including before, during, and after manufacturing and sale of the product. This also includes explaining NDAs, Drug Master Files, and various other standard documents and forms that collectively provide the FDA-approved manufacturing specifications for a pharmaceutical product. He may also explain what cGMPs are and how they are enforced within pharmaceutical companies. He is expected to testify that Teva met and exceeded industry standards and regulations with respect to each of these elements of a QMS.

With respect to PQCs, De Vito is expected to explain what PQCs are, how they compare with adverse event reports, where they come from, and what standards and regulations apply to their intake, investigation, processing, reporting to authorities, and closure. He is expected to testify about how PQCs are analyzed to determine statistically significant trends. He is expected to testify that Teva satisfied applicable standards and regulations pertaining to capturing and processing all PQCs. He is expected to testify that the methods and technologies, such as the Trackwise system, used by Teva to process Paragard PQCs were valid. He is expected to testify that Teva's quality team members performed adequate and appropriate investigations of Paragard PQCs, including proper visual examinations of return samples, testing on "retained" samples from the lot in question, and batch

record review. He is expected to testify that Teva appropriately analyzed PQC data for potential trends related to Paragard. He is expected to testify that Teva provided the FDA timely and appropriate quality-related notices or communications about Paragard. He is expected to testify that all individuals working on PQCs for Paragard were sufficiently qualified. He is expected to testify that Teva's processing of PQCs ensured that potential evidence of deviations from Paragard's approved manufacturing specifications would be properly captured.

De Vito is expected to testify, based on his experience, that the materials and design of Paragard were adequate and appropriate. He may explain how pharmaceutical companies procure raw materials and components for pharmaceutical products and what quality controls they use to ensure they meet FDA-approved specifications. He may testify about the kinds of suppliers and vendors pharmaceutical companies use, the methods for validating them, and the standards, requirements, and expectations that apply to them. He may testify about storage methods and periods for raw materials, components, and completed inventory. He may explain the processes pharmaceutical companies employ to ensure raw materials and components are assembled in accordance with approved specifications. He may explain how samples from batches are kept for annual "stability" testing and for complaint investigations. He may explain what regular and

irregular data submissions and communications are made to the FDA regarding the materials and manufacturing process of pharmaceuticals.

With respect to the materials and manufacturing specifications approved for Paragard, he is expected to testify that Teva's procurement, manufacturing and assembly, storage, and quality control processes for Paragard satisfied all standards and regulations during Teva's marketing of Paragard. He is expected to testify that Teva had adequate policies and procedures in place to ensure adherence to cGMP at all its sites including at the Paragard manufacturing facility in Buffalo. He is expected to testify that Teva properly performed periodic self-audits of its teams and processes related to Paragard, as well as audits of its outside vendors supplying goods or service related to Paragard. He is expected to testify that Teva properly submitted data and information to the FDA regarding Paragard materials and manufacturing for regulatory review and oversight.

De Vito is expected to testify that Teva was subject to periodic FDA inspections and oversight, and that, in his contemporaneous opinion, Teva adequately and appropriately responded to all FDA demands during and after inspections. He may explain the purpose and expectations of FDA inspections of pharmaceutical companies, the meaning and effect of "observations" in 483 letters and Establishment Inspection Reports, and the potential enforcement mechanisms the FDA could use against pharmaceutical companies that are not performing

adequately or appropriately. He is expected to testify that the FDA never ordered Teva to remove Paragard from the market or took any enforcement action against Teva with regard to any quality or safety issues. He is expected to testify that the FDA never cited Teva specifically for issues pertaining to its procurement or storage of polyethylene or copper for Paragard or expressed any concern that the materials degraded or oxidized even though they had numerous opportunities to do so had there been a genuine problem.

De Vito is expected to provide his contemporaneous opinion that Teva initiated and executed CAPA plans related to Paragard in an appropriate manner. He may explain what CAPAs are in the pharmaceutical industry and how they are initiated, tracked, and managed. He is expected to testify that Teva had the proper technology and procedures in place to ensure its CAPA practices followed standards and regulations. He may explain what warrants or necessitates a product recall (from a quality standpoint), the various types of recalls, and the necessary communications to the public and/or authorities. He may testify that Teva conducted one voluntary recall of Paragard due to the failure of a sterility test on a lot on stability, and he may provide his contemporaneous opinion that Teva's analysis and response with respect to that incident, formulating its response, and communicating the recall all exceeded the standard of care.

De Vito is expected to provide his contemporaneous opinion that, from a quality perspective, Paragard and its materials and design were safe and effective for the labeled and approved use.

Finally, De Vito may provide contemporaneous expert opinion about any documents pertaining to the quality management or materials & design of Paragard or any other topic on which he has been identified as Teva's corporate witness. His opinions are based solely on his education, training, knowledge, experience, and responsibilities as a quality professional and licensed pharmacist. He has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

### 3. Brandon (Brandi) Howard, NP, PhD

Howard will provide testimony and opinions consistent with her education, training, personal knowledge, and experience as a registered nurse, nurse practitioner, medical science liaison, and medical director in the women's health pharmaceutical and biotech industry, and with the deposition testimony she has already given in litigation, concerning the safety and efficacy of the Paragard IUD and the appropriateness of Teva's conduct.

Howard received her Bachelor of Science in nursing from Medical College of Georgia in 1995. Subsequently, as a registered nurse, she practiced at several hospitals and clinics for two years. She then received her Master of Science in

women's health and perinatology from Georgia State University in 1999 and became a women's health nurse practitioner. After several years, she became involved in clinical trials for pharmaceutical companies and was recruited to become a medical science liaison ("MSL") for Organon USA. She then obtained her PhD from the University of Pennsylvania in 2007, where her research area of interest was in adolescent sexual risk behaviors and contraceptive use.

After obtaining her PhD, in 2007, Howard joined Duramed Research, Inc. ("Duramed") as an MSL. As an MSL, she was responsible for all of Duramed's products, including Paragard and other contraceptive products, in the northeastern United States. As an MSL for Duramed, she was responsible for responding to unsolicited questions about the products; supporting medical education initiatives; delivering medical education and clinical presentations to residency programs and other settings; and working with thought leaders in academia and clinical medicine. In December 2008, Paragard was acquired by Teva. In July 2009, she was promoted to senior manager of MSLs. Her responsibilities expanded to include managing six MSLs, hiring and training MSLs, evaluating individual MSLs and the MSL team, and developing the MSL team's strategic plan.

In April 2010, Howard was promoted to Assistant Medical Director of the Women's Health Division. As Assistant Medical Director, she continued to manage the team of MSLs and took on more responsibilities including providing medical

expertise within and without the company. In January 2012, she was promoted to Associate Director, Global Scientific Communications, of the Women's Health Division. In this role, Howard's responsibilities involved external publications, such as for journals and conferences, related to Teva products worldwide. In February 2013, she was promoted to Medical Director of the Women's Health Division. From September 2014 to December 2015, Howard served as Teva's Senior Director, Head of US Field Medical Affairs. In this role, she participated in the North American Medical Affairs Leadership Team (including the heads of Medical Information, Medical Education, Medical Directors, and Canada Medical Affairs), and reported to the Vice President and Head of North America Medical Affairs. As a medical expert for Teva regarding Teva's products internally and externally, Howard was an educational resource when internal stakeholders, clinicians, or thought leaders had questions regarding Teva's products, including Paragard. Howard subsequently left Teva to join Evofem, Inc., another pharmaceutical company, to serve as its Vice President in Global Medical Affairs.

Howard is expected to provide her contemporaneous opinion that Paragard is safe and effective for its labeled and approved use. She is expected to explain the clinical data she has reviewed throughout her training, education, and experiences that support the marketing of and labeling for Paragard. She is expected to explain the scientific literature and discourse regarding the risks and benefits of Paragard

and other contraceptives. She may explain how Paragard is placed and removed and its mechanism of action. She may testify about women's health, fertility and infertility, obstetric and gynecological issues related to contraceptive use, and the medical history of IUDs and contraceptives prior to Paragard. She is expected to testify about the standard of care and scientific knowledge in the healthcare community, which support the safety and efficacy profile of Paragard and the use of Paragard according to the label. She may also testify about how a healthcare provider discusses Paragard to patients and counsels them on the decision to use Paragard or other form of birth control based on her training and experience.

Howard is expected to testify the label and information provided to patients for Paragard were adequate and appropriate. She is expected to testify that the label provides a robust explanation of the instructions for use and the risks/benefits of Paragard to the intended medical audiences. She is expected to testify that the possibility of breakage of the arms is sufficiently explained in the label, and that breakage, embedment, perforation, and need for follow-up procedures are all well-known risks among the medical community. She is expected to testify that the frequency of breakage of the arms, though not precisely known, has been estimated by various researchers over the years and has been relatively infrequent. In Howard's position as Medical Director, she is sometimes called upon to participate in the copy-review of brochures and marketing materials and provide input from a medical

perspective; accordingly, she may give testimony regarding the accuracy and appropriateness of such documents and how patient brochures and professional education materials are used from a medical perspective.

Howard is expected to testify about the adequacy and appropriateness of Teva's provision of medical information regarding Paragard, including its responses to unsolicited requests for medical information. She is expected to testify that Teva's MSLs and third-party vendor provided medically accurate and vetted responses to inquiries from health care providers over the phone and in writing. She is expected to testify that the Medical Affairs department made a reasonable effort to disseminate information regarding the proper use of Paragard. Despite the adequacy of the label and other informational materials, Howard may testify about reports that healthcare providers have bent and inserted Paragard incorrectly, which would not yield expected results. She may testify about Teva's initiatives to continuously train healthcare providers on proper Paragard placement technique.

Finally, Howard may provide contemporaneous expert opinion about any documents pertaining to medical aspects of Paragard or any other topic on which she has been identified as Teva's corporate witness from a medical perspective. Her opinions are based solely on her education, training, knowledge, experience, and responsibilities as a registered nurse, nurse practitioner, MSL, and Medical Director.

She has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## 4. Thomas Mehs

Mehs will provide testimony and opinions consistent with his education, training, personal knowledge, and experience as a decades-long pharmaceutical quality management professional, and with the deposition testimony he has already given in litigation, concerning Teva's quality system and the materials and design of the Paragard IUD.

Mehs received his Bachelor of Science in applied statistics from Rochester Institute of Technology in New York in 1994. In 1997, he joined FEI Products, one of the previous owners of the Paragard NDA, as a Quality Engineer in the North Tonawanda Paragard manufacturing site. He was responsible for validating equipment used to manufacture the Paragard, oversaw Paragard's stability program, and prepared and evaluated quality data, among other activities related to Paragard. In 2002, he was made Manager, Quality Assurance and Regulatory Affairs. As Manager of Quality Assurance and Regulatory Affairs, he oversaw the quality of the product from start to finish. He oversaw manufacturing specifications and procedures, quality systems, testing of incoming raw materials and components, change control, non-conformance reporting, complaint reporting, and on-site regulations. In 2008, his was promoted to Senior Manager of Quality. In December

2008, the Paragard NDA was acquired by Teva. He continued to oversee the quality function at the North Tonawanda site for the entire time he worked at Teva. In November 2017, the Paragard NDA was acquired by CooperSurgical, Inc., and Mehs transferred to CooperSurgical along with the North Tonawanda site.

Mehs is expected to provide his contemporaneous opinion that Teva's quality system as it related to Paragard was adequate and appropriate. He is expected to explain what a quality system in a pharmaceutical company does and why. This includes providing explanations regarding the various departments, teams, functions, policies, procedures, technologies, and other checks and balances employed by pharmaceutical companies as part of their quality system. This also includes explaining the different quality assurance processes throughout the life cycle of a product, including before, during, and after manufacturing and sale of the product. This also includes explaining NDAs, Drug Master Files, and various other standard documents and forms that collectively provide the FDA-approved manufacturing specifications for a pharmaceutical product. He may also explain what current Good Manufacturing Practices ("cGMP") are and how they are enforced within pharmaceutical companies. He is expected to testify that Teva met and exceeded industry standards and regulations with respect to each of these elements of a QMS.

Mehs is expected to provide his contemporaneous opinion that PQC regarding Paragard were adequately investigated. He is expected to explain the industry standards and expectations regarding the investigation of a PQC. He is expected to explain that in a PQC investigation, the quality system is only obligated to make a reasonable effort to try to determine if the PQC is valid and if the cause of the PQC is related to the manufacturing process. He is expected to testify that the methods and technologies, such as the TrackWise system, used by Teva to track Paragard PQCs were valid. He is expected to testify that the content of Teva's investigations of Paragard PQCs, including proper visual examinations of return samples, testing on "retained" samples from the lot in question, and batch record review, were adequate and appropriate.

Mehs is expected to testify, based on his experience, how pharmaceutical companies procure raw materials and components for pharmaceutical products and what quality controls they use to ensure they meet FDA-approved specifications. He may testify about the kinds of suppliers and vendors pharmaceutical companies use, the methods for validating them, and the standards, requirements, and expectations that apply to them. He may testify about storage methods and periods for raw materials, components, and completed inventory. He may explain the processes pharmaceutical companies employ to ensure raw materials and components are assembled in accordance with approved specifications. He may explain how samples

from batches are kept for annual "stability" testing and for complaint investigations. He may explain what regular and irregular data submissions and communications are made to the FDA regarding the materials and manufacturing process of pharmaceuticals.

With respect to the materials and specifications for Paragard specifically, Mehs is expected to testify that Teva's procurement, manufacturing and assembly, storage, and quality control processes for Paragard satisfied all standards and regulations during Teva's ownership of the Paragard NDA. He is expected to testify that Teva had adequate policies and procedures in place to ensure adherence to cGMP at all its sites including at the Paragard manufacturing facility in Buffalo. He is expected to testify that Teva properly performed periodic self-audits of its teams and processes related to Paragard, as well as audits of its outside vendors supplying goods or services related to Paragard.

Mehs is expected to testify that the North Tonawanda site was subject to periodic FDA inspections and oversight, and that, in his contemporaneous opinion, Teva adequately and appropriately responded to all FDA requests during and after inspections. He may explain the purpose and expectations of FDA inspections of pharmaceutical companies, the meaning and effect of "observations" in 483 letters and Establishment Inspection Reports, and the potential enforcement mechanisms the FDA could use against pharmaceutical companies that are not performing

adequately or appropriately. He is expected to testify that the FDA never ordered Teva to remove any Paragard from the market or took any enforcement action against Teva with regard to any quality or safety issues. He is expected to testify that the FDA never cited Teva specifically for issues pertaining to its procurement or storage of polyethylene or copper for Paragard or expressed any concern that the materials degraded or oxidized even though they had numerous opportunities to do so had there been a genuine problem.

Mehs is expected to provide his contemporaneous opinion that Teva initiated and executed corrective and preventative action ("CAPA") plans related to Paragard in an appropriate manner. He may explain what CAPAs are in the pharmaceutical industry and how they are initiated, tracked, and managed. He is expected to testify that Teva had the proper technology and procedures in place to ensure its CAPA practices followed standards and regulations.

Finally, Mehs may provide contemporaneous expert opinion about any documents pertaining to the quality management or materials & design of Paragard or any other topic on which he has been identified as Teva's corporate witness. His opinions are based solely on his education, training, knowledge, experience, and responsibilities as a quality professional. He has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

### 5. Angela Randall

Angela Randall will provide testimony and opinions consistent with her education, training, personal knowledge, and experience having worked on drug labeling in the United States as a member of the Regulatory Affairs department of Teva, and with the deposition testimony she has already given in litigation concerning the label for Paragard during Teva's ownership of the Paragard NDA.

Randall joined Teva as a Senior Regulatory Analyst in Copy Approval & Labeling within the Regulatory Affairs department of Teva in June 2011. In March 2013, she was promoted to Manager of Copy Approval and Labeling. In April 2015, she was promoted to Senior Regulatory Affairs Manager of Brands Labeling in Regulatory Affairs. In September 2018, she was promoted to Director of Regulatory Affairs Labeling. In her various positions within the Regulatory Affairs, Randall has had the chance to work on a variety of different drug labels, including Paragard, for more than fourteen years (as of 2025).

Randall is expected to testify that the labeling for Paragard, including the Prescribing Information ("PI"), was adequate and appropriate during Teva's ownership of the Paragard NDA. She is expected to explain what a label for a prescription drug is, who the intended audience is, what it is supposed to communicate, how the information in it can be formatted or organized, and what underlying data must support its contents. She is expected to explain what FDA

regulations govern drug labeling and what oversight the FDA provides pharmaceutical companies regarding labeling. She is expected to explain what departments and teams are involved in product labeling within pharmaceutical companies, how they are organized, and how the responsibilities are allocated. She is expected to explain that drafting a label for a pharmaceutical product is not an exact science and involves professional judgment. She is expected to explain that the same information regarding the risks and benefits of a drug can be presented in more than one way.

Randall is expected to testify that Teva's conduct and activities to ensure the PI (and other product labeling) for Paragard complied with applicable standards and regulations were more than adequate. She may explain the different pathways in which pharmaceutical companies can submit proposals for changes to a drug label, what the requirements are for each pathway, and when proposed changes can be implemented by the pharmaceutical companies. She is expected to testify that Teva inherited the FDA-approved PI from Bard/Duramed and that it was appropriate for Teva not to propose any substantive changes to the preexisting PI. She may explain what the Physician Labeling Rule ("PLR") format is, the history of the PLR format, what drugs were required to follow the PLR format and when, the pros and cons of conversion to PLR format, and the general trend in conversion to PLR format over time. She is expected to testify that conversions to the PLR format was not a high

priority for the FDA and approvals could take several years in her experience. She is expected to testify that Teva complied with applicable standards and regulations with respect to the conversion of Paragard's PI to the PLR format.

Randall is expected to testify that information regarding the risk of breakage upon removal was always provided in the PI (and other product labeling) for Paragard in accordance with all applicable standards and regulations during the entirety of Teva's ownership of the Paragard NDA. She is expected to testify that Teva acted adequately and appropriately with respect to its review, consideration, and analysis of data related to breakage and other potential adverse reactions in drafting proposed changes to the PI for Paragard during Teva's ownership of the Paragard NDA. She is expected to testify that Teva adequately and appropriately communicated and cooperated with the FDA in regards to the content, supporting data, formatting, diagrams, and wording of the PI for Paragard during its ownership of the Paragard NDA. She is expected to explain what class labeling is and what class labeling existed for IUDs during Teva's ownership of the Paragard NDA. She is expected to testify about the adequacy and appropriateness of Teva's organizational structure, policies, standard operating procedures, work instructions, manuals, and multi-layered work flows controlling the people and methods Teva employed to draft or edit the PI for Paragard.

Finally, Randall may provide contemporaneous expert opinion about any documents pertaining to Teva's work on the product labeling for Paragard during Teva's ownership of the Paragard NDA or any other topic on which she has been identified as Teva's corporate witness. Her opinions are based solely on her education, training, knowledge, and experience while working for Teva. She has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## 6. Erin Rose

Erin Rose will provide testimony and opinions consistent with her education, training, personal knowledge, and experience as a pharmacovigilance ("PhV") professional with Teva, and with the deposition testimony she has already given in litigation, concerning Teva's post-market surveillance and PhV activities for the Paragard IUD.

Rose received her Bachelor of Science in Pharmacology and Biology, with a minor in Biochemistry, from McMaster University in Ontario, Canada, in 2005. She received her Master of Science in Pharmacology from the University of Toronto in 2008. She also received a graduate certificate in Pharmaceutical Regulatory Affairs and Quality Operations from Seneca College in Toronto in 2010. She joined Teva as a Quality Assurance Associate in November 2010.

From November 2012 to May 2025, Rose was continuously involved with the medical affairs department and the PhV function of Teva. Specifically, in 2012, she started as a Medical Affairs Associate, which involved providing information for products to patients and healthcare providers ("HCP"), developing relationships within and without Teva to gather medical information for Teva products, performing health hazard assessments, and processing adverse event reports ("AER").

From 2013 to 2015, Rose was Pharmacovigilance & Drug Safety Officer, which involved processing local AERs, local database validation, regional compliance activities, managing corrective and preventative actions ("CAPA"), and ensuring work instructions ("WI") and SOPs complied with current Teva policies and regulations.

From 2015 to 2016, Rose was PhV Compliance Associate in the Global PhV Compliance team. In this role, her responsibilities included performing gap analyses for WIs and SOPs in the Americas region; ensuring CAPAs in the Americas region were identified, documented, and analyzed; participating in the development and enhancement of compliance processes; supporting local safety officers in the Americas region, performing internal compliance audits of Teva affiliates worldwide, and approving CAPA and deviation records.

From 2016 to 2021, Rose was Global PhV Compliance Excellence Lead within Global PhV Compliance. In this role, her responsibilities expanded to include managing and developing PhV professionals, being the global PhV subject matter expert ("SME") for vendor due diligence and data privacy and reconciliation, creating and owning global PhV processes and corporate policies, liaising with internal/external business partners, serving as lead compliance contact and support for regulatory inspections and partner audits in Americas region.

In 2021, Rose was promoted to Associate Director of North America PhV Operations and Compliance. In this role, she provided oversight and direction for all PhV operations and compliance activities in the United States and Canada, and oversaw regional PhV activities such as intake, triage, data entry, reconciliation, follow-up, and submission, among other responsibilities.

In 2023, Rose was promoted to Director and Head of Organized Data within PhV Governance. She has been responsible for developing, executing, and leading the global PhV vision and strategy for Teva Organized Data Governance ("ODG"). She is a senior SME for ODG. She manages and leads a global team of team leaders, individual contributors, and external service providers, and provides end-to-end oversight from a PhV perspective. In August 2024, she also took on the role of Project Lead for Data Quality Improvements, which involves focusing on

improvements to the overall quality of data generated and process by Global PhV at Teva.

Rose is expected to provide her contemporaneous opinion that Teva conducted post-market surveillance and all PhV activities for Paragard with due care and in compliance with applicable standards and regulations during the time that Teva marketed Paragard. Based on her training and experience, she is expected to explain what adverse events ("AE") are, the distinctions between AERs and product quality complaints, and what the processing of an AER entails. She is expected to explain what standards, conventions, and regulations applied to PhV functions with respect to IUDs like Paragard in the United States. She may testify about the variety of management challenges and methodologies related to PhV activities and about the need to exercise judgment. She may provide testimony explaining the databases used by Teva's PhV and QA functions and their similarities and differences.

Rose is expected to testify that Teva performed AER processing activities—including intake, triage, medical review, follow-ups, expectedness assessment, seriousness assessment, causality assessments, coding, quality control, and reporting—adequately and appropriately. She is expected to testify that the corporate principles and policies governing the processing of AERs were consistent with and exceeded applicable standards and regulations; that the SOPs and WIs that applied to the processing of Paragard AERs specifically complied with corporate policies;

and that those SOPs and WIs were properly executed and followed. She is expected to testify that Teva's policies, standards, procedures, and work instructions ensured AERs were timely and correctly validated, described, coded, and submitted to the authorities. She is expected to testify that training of staff in PhV functions was thorough, appropriate, and compliant with applicable policies, standards, and regulations.

Rose is expected to testify that the vendors that provided services pertaining to the processing of AERs to Teva were subject to adequate and appropriate contractual terms requiring compliance with Teva's PhV policies, standards, and regulatory obligations; that vendors' staff underwent appropriate training to ensure understanding of their standards and obligations; that vendors submitted to periodic evaluation and audit by Teva to ensure compliance with their standards and obligations; and that Teva's PhV function appropriately communicated with and supervised the vendors on a daily basis to ensure compliance with their standards and obligations.

Rose is expected to testify that Teva's signal detection activities related to Paragard were adequate and appropriate, that the PhV function performed analysis according to valid scientific and mathematical methods and industry standards, and that no safety signals related to Paragard's design or warning have been validated as actionable with regards to embedment, perforation, and/or breakage of the arms.

Rose is also expected to testify that PhV performed appropriate statistical analyses of AERs and potential safety signals.

Rose is expected to testify that Teva's PhV and QA functions communicated and coordinated with each other in an adequate and appropriate manner. She is expected to testify that employees across all departments and jurisdictions were properly trained to recognize potential adverse events and timely report them to PhV functions through adequate channels, and, vice versa, that PhV timely and appropriately communicated matters potentially related to safety to other departments and management. She is expected to explain what the "reconciliation" process is, and offer opinion that Teva performed this process appropriately. She is expected to testify that, from a PhV perspective, Paragard was safe and effective for its labeled and approved use during the time that Teva marketed Paragard.

Rose is expected to explain the meaning and effect of FDA inspections and observations. She is expected to testify that Teva's responses to FDA inspections and observations were adequate and appropriate.

Finally, Rose may provide contemporaneous expert opinion about any documents pertaining to PhV aspects of Paragard or any other topic on which she has been identified as Teva's corporate witness from a PhV perspective. Her opinions are based solely on her education, training, knowledge, experience, and

responsibilities as a PhV professional. She has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## 7. Hedva Voliovitch, MD, PhD, MBA

Hedva Voliovitch will provide testimony and opinions consistent with her education, training, personal knowledge, and experience as a board-certified physician and senior pharmacovigilance ("PhV") professional with Teva, and consistent with the deposition testimony she has already given in litigation concerning the post-market surveillance and PhV system Teva had in place while it owned the NDA for Paragard.

Voliovitch obtained her MD from Tel-Aviv University, Sackler Medical School, in 1983. She was a resident at Golda Meir Medical Center in Israel from 1985 to 1990. She was a senior physician in the Department of Internal Medicine at Beilinson Hospital (later renamed to Rabin Medical Center) from 1990 to 1992. From 1993 until 2006, she practiced internal medicine at Maccabi Healthcare Services. Meanwhile, she obtained her PhD in molecular cell biology from Weizmann Institute of Science in 1998.

Voliovitch joined Teva as Senior Manager of Drug Safety and Pharmacovigilance, Clinical Trials Department, R&D Division, in 1997 (while pursuing her PhD and continuing her practice of medicine). In 1999, she was promoted to Director of Global Drug Safety and Pharmacovigilance, Clinical Trial

Department, R&D Division. She continued to hold senior managerial positions in Teva's Global Drug Safety and Pharmacovigilance unit throughout her career at Teva. By the time of her retirement in 2019, Voliovitch had been promoted up to Senior Vice President of Global Patient Safety & Pharmacovigilance, Head of Global Patient Safety & Pharmacovigilance, R&D Division. In her 22 years of working on PhV for Teva, she managed multinational teams of hundreds of PhV employees and oversaw PhV databases, systems, and processes for all Teva products worldwide.

Voliovitch is expected to provide her contemporaneous opinion that at all times Teva had a robust post-market surveillance and PhV system exceeding applicable standards and regulations during the time that Teva owned the NDA for Paragard. Based on her decades of experience as a PhV professional in the pharmaceutical industry, she may explain generally what PhV is, what are its objectives, how PhV units achieve their objectives, who comprises the PhV unit, and what systems and processes make up a PhV system. She may explain the differences between PhV, Quality, and Research and Development in their goals and activities. She may explain how the practice of PhV and the applicable standards and expectations have evolved over time. She is expected to testify that Teva's PhV system complied with those standards and expectations when it owned the NDA for Paragard. She is expected to testify that Teva's PhV policies and SOPs adequately

implemented those general requirements. She is expected to testify that Teva's PhV unit adequately complied with its own policies and SOPs. She is expected to testify that Teva had adequate checks in place to ensure that any noncompliance would be caught and rectified. She may explain what an internal audit for a PhV unit is, and offer the opinion that Teva adequately performed and utilized the results of internal audits pertaining to Paragard during the time that Teva owned the NDA for Paragard. She may explain what an FDA inspection entails and what the implications of a 483 observation or finding are. She may testify that Teva complied with all standards and requirements as it pertained to FDA inspections of Teva's PhV system for Paragard.

Voliovitch is expected to testify that Teva's PhV system employed adequate and appropriate methods to analyze safety data, detect potential safety signals, and submit necessary reports to the FDA regarding Paragard. She may explain what safety signals are, how signals are detected, and what kind of judgment needs to be exercised to determine if a potential signal is indeed a signal. She may explain what an adverse event ("AE") is, and how an AE is "coded." She may explain what the MedDRA coding convention is and how it is used in signal detection. She may explain the significance and implications of whether an AE is on the drug labeling. She may explain what the Proportional Reporting Ratio ("PRR") is, how PRR is calculated, how to interpret PRR, the significance of PRR, and the considerations

for setting an appropriate PRR threshold. She is expected to testify that Teva appropriately reviewed AEs and analyzed AE data to detect potential safety signals for Paragard.

Voliovitch is expected to testify that the PhV and Quality units of Teva adequately and appropriately communicated with each other as it related to AEs that potentially concerned product quality and manufacturing. She may explain the distinction between a PQC and an AE. She is expected to testify that from a PhV perspective Teva's analysis of adverse events, individually and in the aggregate, was adequate and appropriate. She is expected to testify that Teva did not validate as actionable a safety signal related to breakage of Paragard in compliance with applicable standards and regulations. She is expected to testify that, from a PhV perspective, Paragard was safe and effective for its labeled and approved use during the time that Teva marketed Paragard.

Finally, Voliovitch may provide contemporaneous expert opinion about any documents pertaining to Teva's PhV system or any other topic on which she has been identified as Teva's corporate witness from a PhV perspective. Her opinions are based solely on her education, training, knowledge, experience, and responsibilities as a PhV professional. She has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## 8.  All Healthcare Providers for Any Plaintiff in This Matter

Plaintiffs' healthcare providers have not been retained by Teva in this matter but if called to testify, their testimony would consist of facts and opinions based on their knowledge, skill, experience, training, and education as medical doctors, surgeons, treating physicians, and nurses for the Plaintiffs. The subject matters and summary of facts and opinions they are expected to testify to include those described in Plaintiffs Alisa Robere, Pauline Rickard, and Melody Braxton's Rule 26(a)(2) Disclosures of Experts served on July 24, 2025, as well as in their deposition testimony given or to be given, and in Plaintiffs' medical records. By making these disclosures, Teva does not waive any objections to the testimony of these witnesses in whole or in part on the basis of admissibility, relevance, hearsay, or other grounds.

### Alisa Robere's Healthcare Providers

1.  Nidia Iglesias, MD

2.  Janice Moscoso, MD

3.  Jose Carugno, MD

### Pauline Rickard's Healthcare Providers

1.  Niloufer Kero, MD

2.  Richard Chlouber, MD

### Melody Braxton's Healthcare Providers

1.  Patricia Turner, ARNP

2. Maria Martino-Villanueva, MD

THIS, the 18th day of August 2025.

Respectfully submitted,

*/s/ Christopher D. Morris*
Christopher D. Morris
Butler Snow LLP
Mississippi Bar No. 102981
Renaissance at Colony Park
Suite 1400
1020 Highland Colony Parkway
Ridgeland, MS 39158
Telephone: (601) 985-4437
chris.morris@butlersnow.com

*/s/ Pamela L. Ferrell*
Pamela L. Ferrell
Butler Snow LLP
Georgia Bar No. 569713
1170 Peachtree Street NE
Suite 1900
Atlanta, GA 30309
Telephone: (678) 515-5011
pamela.ferrell@butlersnow.com

**Co-Lead Counsel for the Teva Defendants**

/s/ Lori G. Cohen
Lori G. Cohen
Allison Ng
Greenberg Traurig, LLP
Georgia Bar No. 174455
 Terminus 200
3333 Piedmont Rd., NE
 Suite 2500
 Atlanta, GA 30305
Telephone: (678) 553.2385
cohenl@gtlaw.com nga@gtlaw.com

**Co-Liaison Counsel for Defendants**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 18th day of August 2025, a copy of the foregoing Teva's Non-Retained Expert Disclosures was served electronically on Plaintiffs via their Lead and Liaison counsel.


*/s/ Christopher D. Morris*
Christopher D. Morris, Esq.