**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF GEORGIA ATLANTA DIVISION**

| | | |
|---|---|---|
| **IN RE: PARAGARD IUD PRODUCTS LIABILITY LITIGATION** | ) ) ) ) ) | **MDL DOCKET NO. 2974** |
| | | **(1:20-md-2974-LMM)** |
| | | **This Document Relates to the Following Cases:** |
| | | **Alisa Robere (1:22-cv-1583)** |
| | | **Melody Braxton (1:22-cv-00490)** |
| | | **Pauline Rickard (1:21-cv-03861)** |

## <u>COOPERSURGICAL'S NON-RETAINED EXPERT DISCLOSURES</u>

Defendants CooperSurgical, Inc. ("CooperSurgical"), and The Cooper Companies, Inc., pursuant to Federal Rule of Civil Procedure 26(a)(2)(c), provide the following written disclosures for these non-retained expert witnesses:

1. Vrunda Desai, MD

2. Thomas Mehs

3. William Senatore, PharmD

4. Zafar Toor

5. Healthcare Providers

## I.    **Vrunda Desai, MD**

Desai will provide testimony and opinions consistent with her education, training, personal knowledge, and experience as a board-certified OB-GYN, an Associate Professor, Adjunct, at Yale School of Medicine, and CooperSurgical's

Vice President, Medical Affairs and Clinical Strategy, and with the deposition testimony she has given in this litigation, concerning the safety and efficacy of the Paragard IUD and the appropriateness of CooperSurgical's conduct.

Desai received her medical degree from Robert Wood Johnson Medical School at Rutgers University in New Jersey in 2006. Immediately following medical school, she did a residency at Cornell University in obstetrics and gynecology, during which she first evaluated and used Paragard and trained others on Paragard. She did a fellowship in minimally invasive gynecology and robotic surgery at North Shore University Hospital in New York. In 2013, she was certified by the American Board of Obstetrics and Gynecology, and she started teaching OB-GYN as the associate clinical director at Yale School of Medicine. Before joining CooperSurgical as Medical Director in 2018, Desai counseled patients about all kinds of contraceptives (including Paragard), recommended and placed Paragard in appropriate patients for twelve years, and taught medical students about Paragard and other contraceptives for five years.

As Medical Director at CooperSurgical, Desai supervised the Medical Affairs department, which provides the company's various stakeholders with medical expertise as needed. Her department helps perform medical oversight of CooperSurgical's products, including the Paragard, which means reviewing internal and published scientific literature, engaging with the medical community in person

at conferences and remotely through electronic communication, analyzing reports of adverse events, and providing medical data and opinions to other departments (including regulatory, quality, and marketing) within the company.

Desai is expected to provide her contemporaneous opinion that Paragard is safe and effective for its labeled and approved use. She is expected to explain the clinical data she has reviewed that support the marketing of and labeling for Paragard throughout her training and experiences. She is expected to explain the scientific literature and discourse regarding the risks and benefits of Paragard and other contraceptives. She may explain how Paragard is placed and removed and its mechanism of action. She may testify about women's health, fertility and infertility, obstetric and gynecological issues related to contraceptive use, and the medical history of IUDs and contraceptives prior to Paragard. She is expected to testify about the standard of care and scientific knowledge in the medical community she practiced and taught in, which support the safety and efficacy profile of Paragard and the use of Paragard according to the label. She may also testify about how a healthcare provider discusses Paragard to patients and counsels them on the decision to use Paragard or other forms of birth control based on her training and experience.

Desai is expected to testify that the label and information provided to patients for Paragard were adequate and appropriate. She is expected to testify that the label provides a robust explanation of the instructions for use and the risks/benefits of

Paragard to the intended medical audiences. She is expected to testify that the possibility of breakage of the arms is sufficiently explained in the label, and that breakage, embedment, perforation, and need for follow-up procedures are all well-known risks among the medical community. She is expected to testify that the frequency of breakage of the arms, though not precisely known, has been estimated by various researchers over the years and has been relatively infrequent. She is expected to testify that, while the precise cause of breakage is unknown, there are several working hypotheses. In Desai's position as Medical Director, she was sometimes called upon to participate in the copy-review of brochures and marketing materials and provide input from a medical perspective; accordingly, she may give testimony regarding the accuracy and appropriateness of such documents and how patient brochures and professional education materials are used from a medical perspective.

Desai is expected to testify about the adequacy and appropriateness of CooperSurgical's provision of medical information regarding Paragard, including its responses to unsolicited requests for medical information. She is expected to testify that CooperSurgical hired a validated vendor to receive inquiries about the product and provide medically accurate and vetted responses to health care providers over the phone and in writing. She is expected to testify that the Medical Affairs department made a reasonable effort to disseminate information regarding the proper

4

use of Paragard. Despite the adequacy of the label and other informational materials, Desai may testify about reports that healthcare providers have bent and inserted Paragard incorrectly, which would not yield expected results. She may testify about CooperSurgical's initiatives to continuously train healthcare providers on proper Paragard placement technique.

Desai may testify about the adequacy and appropriateness of CooperSurgical's post-marketing surveillance system, i.e., the intake, medical review, coding, submission to FDA, and analysis of adverse event reports. She may explain CooperSurgical's corporate, regulatory, and industry obligations, policies, and conventions with respect to adverse event reporting and analysis. She may testify that no safety signal for Paragard has ever been validated as actionable and that the methods employed for signal detection were scientifically valid. She may testify that CooperSurgical did not have any scientific or statistical basis for suspecting that there was any issue with the warnings or design of Paragard or that the warnings and design needed to be modified to address breakage or for any other safety reason. She may testify about the contents, bases, and appropriateness of CooperSurgical's responses to FDA inspections and requests for information.

Desai may testify about the single-handed inserter for the Paragard, and medical opinions formed in the course of clinical trial and safety review of the inserter.

Finally, Desai may provide contemporaneous expert opinion about any documents pertaining to medical aspects of Paragard or any other topic on which she has been identified as CooperSurgical's corporate witness from a medical perspective. Her opinions are based solely on her education, training, knowledge, experience, and responsibilities as a practicing OB-GYN, medical school professor, and as a former Medical Director and current head of Medical Affairs and Clinical Strategy for CooperSurgical. She has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## II.  Thomas Mehs

Mehs will provide testimony and opinions consistent with his education, training, personal knowledge, and experience as a decades-long pharmaceutical quality management professional, and with the deposition testimony he has already given in litigation, concerning CooperSurgical's quality system and complaint handling process, its response to FDA's 2021 Information Requests, and the materials and design of the Paragard IUD.

Mehs received his Bachelor of Science in applied statistics from Rochester Institute of Technology in New York in 1994. In 1997, he joined FEI Products, one of the previous owners of the Paragard New Drug Application ("NDA"), as a Quality Engineer in the North Tonawanda Paragard manufacturing site. He was responsible for validating equipment used to manufacture the Paragard, oversaw Paragard's

stability program, and prepared and evaluated quality data, among other activities related to Paragard. In 2002, he was made Manager, Quality Assurance and Regulatory Affairs. As Manager of Quality Assurance and Regulatory Affairs, he oversaw the quality of the product from start to finish. He oversaw manufacturing specifications and procedures, quality systems, testing of incoming raw materials and components, change control, non-conformance reporting, complaint reporting, and on-site regulations. In 2008, he was promoted to Senior Manager of Quality. In December 2008, the Paragard NDA was acquired by Teva Pharmaceuticals USA, Inc. and Teva Women's Health, LLC (collectively, "Teva"). He continued to oversee the quality function at the North Tonawanda site for the entire time he worked at Teva. In November 2017, the Paragard NDA was acquired by CooperSurgical, Inc., and Mehs transferred to CooperSurgical along with the North Tonawanda site.

Following his transfer to CooperSurgical in 2017, Mehs remained as Senior Manager of Quality, where he was responsible for quality management of the North Tonawanda facility. In this role, Mehs oversaw the quality systems for Paragard and was responsible for complaint investigations related to Paragard. In July 2023, Mehs transitioned to Product and Process Engineer, where he currently leads the state registration and licensing process for CooperSurgical's Trumbull facility and new Texas distribution center. Additionally, as part of his new role, Mehs will be called

upon in certain instances to provide assistance with Paragard-specific responsibilities.

Mehs is expected to provide his contemporaneous opinion that CooperSurgical's quality system as it relates to Paragard is adequate and appropriate. He is expected to explain what a quality system in a pharmaceutical company does and why. This includes providing explanations regarding the various departments, teams, functions, policies, procedures, technologies, and other checks and balances employed by pharmaceutical companies as part of their quality system. This also includes explaining the different quality assurance processes throughout the life cycle of a product, including before, during, and after manufacturing and sale of the product. This also includes explaining New Drug Applications, Drug Master Files, and various other standard documents and forms that collectively provide the FDA-approved manufacturing specifications for a pharmaceutical product. He may also explain what cGMPs are and how they are enforced within pharmaceutical companies. He is expected to testify that CooperSurgical meets and exceeds industry standards and regulations with respect to each of these elements of a QMS.

Mehs is expected to provide his contemporaneous opinion that PQCs regarding Paragard are adequately investigated. He is expected to explain the industry standards and expectations regarding the investigation of a PQC. He is expected to explain that in a PQC investigation, the quality system is only obligated

to make a reasonable effort to try to determine if the PQC is valid and if the cause of the PQC is related to the manufacturing process. He is expected to testify that the methods and technologies, such as the TrackWise system, used by CooperSurgical to track Paragard PQCs are valid. He is expected to testify that the content of CooperSurgical's investigations of Paragard PQCs, including proper visual examinations of return samples, testing on "retained" samples from the lot in question, and batch record review, are adequate and appropriate.

Mehs is expected to testify, based on his experience, how pharmaceutical companies procure raw materials and components for pharmaceutical products and what quality controls they use to ensure they meet FDA-approved specifications. He may testify about the kinds of suppliers and vendors pharmaceutical companies use, the methods for validating them, and the standards, requirements, and expectations that apply to them. He may testify about storage methods and periods for raw materials, components, and completed inventory. He may explain the processes pharmaceutical companies employ to ensure raw materials and components are assembled in accordance with approved specifications. He may explain how samples from batches are kept for annual "stability" testing and for complaint investigations. He may explain what regular and irregular data submissions and communications are made to the FDA regarding the materials and manufacturing process of pharmaceuticals.

With respect to the materials and specifications for Paragard specifically, Mehs is expected to testify that CooperSurgical's procurement, manufacturing and assembly, storage, and quality control processes for Paragard satisfied all standards and regulations during CooperSurgical's ownership of the Paragard NDA. He is expected to testify that CooperSurgical has adequate policies and procedures in place to ensure adherence to cGMPs at all its sites including at the Paragard manufacturing facility in Buffalo. He is expected to testify that CooperSurgical properly performs periodic self-audits of its teams and processes related to Paragard, as well as audits of its outside vendors supplying goods or services related to Paragard.

Mehs is expected to testify that the North Tonawanda site was subject to periodic FDA inspections and oversight, and that, in his contemporaneous opinion, CooperSurgical adequately and appropriately responded to all FDA requests during and after inspections. He may explain the purpose and expectations of FDA inspections of pharmaceutical companies, the meaning and effect of an FDA form 483 and "observations" in 483 letters and Establishment Inspection Reports, and the potential enforcement mechanisms the FDA could use against pharmaceutical companies that are not performing adequately or appropriately. He is expected to testify that the FDA has never ordered CooperSurgical to remove Paragard from the market or took any enforcement actions against CooperSurgical with regard to any quality or safety issues. He is expected to testify that the FDA has never cited

CooperSurgical specifically for issues pertaining to its procurement or storage of polyethylene or copper for Paragard or expressed any concern that the materials degraded or oxidized even though they had numerous opportunities to do so had there been a genuine problem. In response to these inspections, Mehs is expected to provide his contemporaneous opinion that CooperSurgical initiates and executes corrective and preventative action ("CAPA") plans related to Paragard in an appropriate manner. He may explain what CAPAs are in the pharmaceutical industry and how they are initiated, tracked, and managed. He is expected to testify that CooperSurgical has the proper technology and procedures in place to ensure its CAPA practices followed standards and regulations.

Mehs may also explain the FDA's 2021 Information Request on CooperSurgical and the company's subsequent responses. Mehs is expected to testify that in his contemporaneous opinion, CooperSurgical adequately and appropriately responded to all of the FDA's requests. He is also expected to testify that the FDA has never ordered CooperSurgical to remove Paragard from the market or took any enforcement actions against CooperSurgical with regard to any quality or safety issues as a result of the FDA's information request or any of CooperSurgical's responses.

Finally, Mehs may provide contemporaneous expert opinion about any documents pertaining to the quality management or materials & design of Paragard

or any other topic on which he has been identified as CooperSurgical's corporate witness. His opinions are based solely on his education, training, knowledge, experience, and responsibilities as a quality professional. He has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## III.    William Senatore, PharmD

William Senatore will provide testimony and opinions consistent with his education, training, personal knowledge, and experience as a decades-long pharmaceutical quality management professional and a licensed pharmacist, and with the deposition testimony he has already given in litigation, concerning CooperSurgical's pharmacovigilance activities, quality management system ("QMS"), and complaint handling processes.

In 2007, Senatore received his bachelor's degree and Doctor of Pharmacy through a six-year program at Temple University School of Pharmacy. Following his graduation from Temple University School of Pharmacy, Senatore worked at two different pharmacies in Pennsylvania until 2011. Since 2011, Senatore has been continuously employed by several pharmaceutical companies in quality management, pharmacovigilance activities, product production, and other roles. From 2011 to 2020, he was employed at Pentec Health, a 503A and 503B pharmacy. Beginning as a Specialty Infusion Pharmacist, he was responsible for supervising and managing a team of pharmacists and technicians, providing clinical

consultations for nurses, doctors, and patients, and processing and compounding sterile intrathecal prescription orders. As Production Supervising Pharmacist, he was responsible for supervising the production of sterile compounded dosage forms, writing and developing batch records for sterile compounding processes, and writing policies and procedures to maintain a current GMP facility. As Head of Production/Pharmacist-in-Charge, he was responsible for approving validation of automated equipment, leading operational investigations for compliance deviations, and serving as the subject matter expert and lead for regulatory inspections and inquiries. Throughout his time at Pentec Health, Senatore often interacted with the FDA in the context of audits and inspections.

From 2020 to 2022, he worked at Aurobindo Pharma USA, where he served as Director of Pharmacovigilance and Quality Assurance. Senatore worked in both pharmacovigilance and quality assurance and was responsible for corporate pharmacovigilance and quality assurance personnel. In his pharmacovigilance role, he served as the responsible person for all generic products in the United States and both pre-market and post-market brand products. During his time at Aurobindo, he drafted pharmacovigilance and quality assurance SOPs and provided quality compliance, controlled substance, cGMP, and pharmacovigilance training for all new personnel. Senatore was also responsible for participating in FDA inspections and leading all pharmacovigilance audits and inspections.

Senatore joined CooperSurgical in August 2022 as Director of Quality Assurance. Until January 2024, he was responsible for managing the Site Head of Quality Assurance and Pharmacovigilance Manager for Paragard and overseeing all quality improvement and remediation activities at the North Tonawanda facility. As part of this role, Senatore ensured that the site was inspection and audit ready while also providing support for regulatory inspections as well as internal and external audits. Since January 2024, as Senior Director of Quality Assurance – Medical Device and Pharmaceuticals, he manages the Site Heads of Quality Assurance for four manufacturing sites and the Pharmacovigilance Manager. He also provides strategic leadership and direction to the Quality Assurance and Pharmacovigilance personnel to ensure compliance with regulations for CooperSurgical's QMS across the four manufacturing sites and the Pharmacovigilance team.

Senatore is expected to opine that CooperSurgical's QMS as it relates to Paragard is adequate and appropriate. He is expected to explain what a QMS in a pharmaceutical company does and why. This includes providing explanations regarding the various departments, teams, functions, policies, procedures, technologies, and other checks and balances employed by pharmaceutical companies as part of their QMS. This also includes explaining the different quality assurance ("QA") processes throughout the life cycle of a product, including before, during, and after manufacturing and sale of the product. He may also explain what current

Good Manufacturing Practices ("cGMP") are and how they are enforced within pharmaceutical companies. He is expected to testify that CooperSurgical met, exceeded, and continues to meet and exceed, industry standards and regulations with respect to each of these elements of a QMS.

With respect to product quality complaints ("PQC"), Senatore is expected to explain what PQCs are, how they compare with adverse event reports, where they come from, and what standards and regulations apply to their intake, investigation, processing, reporting to authorities, and closure. He is expected to testify about how PQCs are analyzed to determine statistically significant trends and that CooperSurgical satisfies applicable standards and regulations pertaining to capturing and processing all PQCs. He may explain that the methods and technologies, such as the TrackWise system, used by CooperSurgical to process Paragard PQCs are valid. He is expected to testify that CooperSurgical's quality team members perform adequate and appropriate investigations of Paragard PQCs, including proper visual examinations of return samples, testing on "retained" samples from the lot in question, and batch record review.

Likewise, Senatore is expected to testify that CooperSurgical appropriately analyze PQC data and drug safety profiles for potential trends related to Paragard. He is expected to testify that CooperSurgical provided the FDA timely and appropriate quality-related notices or communications about Paragard, that all

individuals working on PQCs for Paragard are sufficiently qualified, and that CooperSurgical's processing of PCQs ensure that potential evidence of deviations from Paragard's approved manufacturing specifications would be properly captured.

Regarding pharmacovigilance, Senatore may detail CooperSurgical's engagement of third-party vendors to conduct pharmacovigilance activities, including its management of these vendors, and the reasoning behind, and benefits of, using outside vendors to assist with adverse event intake and reporting. Senatore is expected to testify that Diligent Health's, PrimeVigilance's, and ProPharma's pharmacovigilance system employed, and continues to employ, adequate and appropriate methods to analyze safety data, detect potential safety signals, and submit necessary reports to the FDA regarding Paragard. He may explain what safety signals are, how signals are detected, and what kind of judgment needs to be exercised to determine if a potential signal is indeed a signal. He may also explain what an adverse event ("AE") is, and how an AE is "coded." He may explain what the MedDRA coding convention is and how it is used in signal detection. He is expected to testify that CooperSurgical appropriately manages these outside vendors and reviews the work done to ensure that the vendors properly reviewed and analyzed AE data to detect potential safety signals for Paragard.

With respect to the manufacturing processes of Paragard at the North Tonawanda facility, Senatore is expected to testify that CooperSurgical's

procurement, manufacturing and assembly, storage, and quality control processes for Paragard satisfy all standards and regulations. He is expected to testify that CooperSurgical has adequate policies and procedures in place to ensure adherence to cGMP at all its sites including at the manufacturing facility in North Tonawanda. He is expected to testify that CooperSurgical properly performs periodic self-audits of its teams and processes related to Paragard, as well as audits of its outside vendors supplying goods or services related to Paragard. He is expected to testify that CooperSurgical properly submits data and information to the FDA regarding Paragard materials and manufacturing for regulatory review and oversight.

Senatore is expected to testify that CooperSurgical was subject to periodic FDA inspections and oversight, and that, in his contemporaneous opinion, CooperSurgical adequately and appropriately responded to all FDA demands during and after inspections. He may explain the purpose and expectations of FDA inspections of pharmaceutical companies, the meaning and effect of an FDA form 483 and "observations" in 483 letters and Establishment Inspection Reports, and the potential enforcement mechanisms the FDA could use against pharmaceutical companies that are not performing adequately or appropriately. He is expected to testify that the FDA has never ordered CooperSurgical to remove Paragard from the market or took any enforcement actions against CooperSurgical with regard to any quality or safety issues.

Senatore is expected to provide his contemporaneous opinion that CooperSurgical initiates and executes corrective and preventative action ("CAPA") plans related to Paragard in an appropriate manner. He may explain what CAPAs are in the pharmaceutical industry and how they are initiated, tracked, and managed within CooperSurgical. He is expected to testify that CooperSurgical has the proper technology and procedures in place to ensure its CAPA practices followed standards and regulations. He may explain what warrants or necessitates a product recall (from a quality standpoint), the various types of recalls, and the necessary communications to the public and/or authorities. He may testify that CooperSurgical conducted one voluntary recall of Paragard due to the failure of a sterility test on a lot on stability, and he may provide his contemporaneous opinion that CooperSurgical's analysis and response with respect to that incident, formulating its response, and communicating the recall all exceeded the standard of care.

Finally, Senatore is expected to testify as to how the labels for pharmaceutical products, including Paragard, are graded. He may explain that CooperSurgical has never received a pharmacovigilance correspondence, quality complaint, or adverse event report complaining of illegible labels. He may also provide contemporaneous expert opinion about any documents pertaining to the quality management, including complaint handling processes at the North Tonawanda facility, pharmacovigilance activities, or any other topic on which he has been identified as CooperSurgical's

corporate witness. His opinions are based solely on his education, training, knowledge, experience, and responsibilities as quality professional and licensed pharmacologist. He has not reviewed any plaintiff-specific materials or provided opinions solely for purposes of litigation.

## IV.    **Zafar Toor**

Zafar Toor will provide testimony and opinions consistent with his education, training, personal knowledge, and experience as a pharmaceuticals regulatory advertisement and promotions expert and CooperSurgical's regulatory consultant, and with the deposition testimony he has already given in litigation concerning CooperSurgical's compliance with the federal Food and Drug Administration's (FDA) regulations and guidance regarding its marketing and promotion of Paragard and the appropriateness and expertise of CooperSurgical's conduct.

Toor received his Doctor of Pharmacy (PharmD) from Rutgers University in May 2003. Thereafter, he completed his post-doctoral fellowship from 2003 to 2004 and then went to work for an advertising agency that specialized in pharmaceutical companies. In 2005, he joined Schering-Plough Pharmaceuticals where his primary role was to review and approve promotional material for pharmaceutical companies. Following this position, Toor began working for Eisai, a Japanese healthcare company, where he also reviewed and approved promotional materials. In May 2015, Toor founded Pharmashift, a regulatory advertisement and promotion

consulting company, where he continues to serve as President. From July 2016 to October 2019, Toor served as the Senior Director for Regulatory Affairs at Lexicon Pharmaceuticals. Then from October 2019 to January 2021, Toor worked for NS Pharma, Inc., as the US Head of Regulatory Affairs.

As President of Pharmasift, Toor has provided commercial regulatory consulting for more than 26 pharmaceutical companies, including CooperSurgical. From approximately January 2022 to approximately October 2024, Toor was contracted with CooperSurgical as a regulatory compliance and submission specialist. In that role, Toor reviewed and approved promotional and training material, provided regulatory feedback to CooperSurgical, and helped with the submission of materials to the FDA. As part of the review and approval process, Toor provided CooperSurgical guidance on industry activities and enforcement developments, as well as training to ensure that CooperSurgical was compliant in terms of advertising and promotion. In this role, he also consulted on and used CooperSurgical's Veeva Vault system which was utilized by the Promotional Advertising Review Committee (PARC) to review promotional and training materials. Toor served as the regulatory representative on the PARC committee, along with representatives from medical, legal, and marketing. Toor was also involved in updating CooperSurgical's standard operating procedures associated with the preparation, review, and approval process for marketing materials. Toor

was required to stay abreast of FDA guidelines and provide fair and balanced concept training and transition training to the next incoming regulatory personnel. Toor's role also required him to review and educate CooperSurgical on FDA Enforcement Action Letters, including Warning and Untitled letters and interpret and apply that guidance to Paragard materials. Toor also provided CooperSurgical regulatory guidance with the single-handed inserter label change so that it was consistent with the Physician Labeling Rule formatting requirements.

Toor is expected to explain that CooperSurgical's internal review processes, including, but not limited to the PARC committee, work to ensure that all branded promotional materials are properly reviewed and submitted to the FDA in accordance with the applicable regulations.

He is expected to testify that CooperSurgical's PARC committee reviews internal and non-promotional materials for accuracy, balance, objectivity, clinical significance, and appropriate scientific representation to ensure that the content and intended use is truthful, not misleading, includes appropriate context, is complete and ensures compliance. This includes sales training materials, speaker program materials, scientific exchange presentations, communications that discuss nonpromotional content, disease awareness, or provide important health information to consumers or healthcare practitioners that can encourage consumers to seek health care and discuss treatment and/or treatment options. He is expected to testify that the

PARC committee members from legal, regulatory, and medical all reviewed and approved each marketing and promotional piece prior to their submission to the FDA for use in the market. Toor is expected to explain the different components of the FDA-approved label, prescribing information and inserts, and the purpose of each. He is expected to explain what information the FDA requires be included in certain promotional materials, how it must be presented, and why. Similarly, he is expected to explain why certain information may not be required or is not allowed by the FDA in certain promotional pieces. He is expected to explain that, in accordance with FDA guidance and regulations, the FDA-approved label and the audience for each promotional piece determines what information is required to be included. In other words, marketing materials directed towards healthcare providers have different requirements than those directed towards consumers. He is also expected to explain that the type of promotional material affects the fair and balanced analysis. For example, print ads have different considerations and requirements than television or radio ads. He is expected to testify that the Paragard label as approved by the FDA contains multiple references to breakage. The manner in which breakage was included in promotional materials, including but not limited to direct-to-consumer advertisements, was consistent with FDA regulations and guidance. He is expected to explain the FDA's Enforcement Action Letters and "bad ad" program, including their history, process and purpose.

Toor may provide contemporaneous expert opinions about any documents pertaining to FDA requirements, enforcement actions or guidance, or any other topic related to regulatory compliance. His opinions are based on his education, training, knowledge, experience and responsibilities as a pharmaceutical regulatory advertisement and promotions expert. He has not reviewed any case specific materials or provided opinions solely for purposes of litigation.

## V.    All Healthcare Providers for Any Plaintiff in This Matter

Plaintiffs' healthcare providers have not been retained by CooperSurgical in this matter but if called to testify, their testimony would consist of facts and opinions based on their knowledge, skill, experience, training, and education as medical doctors, surgeons, treating physicians, and nurses for the Plaintiffs. The subject matters and summary of facts and opinions they are expected to testify include those described in Plaintiffs Alisa Robere, Pauline Rickard, and Melody Braxton's Rule 26(a)(2) Disclosures of Experts served on July 24, 2025, as well as in their deposition testimony given or to be given, and in Plaintiffs' medical records. By making these disclosures, CooperSurgical does not waive any objections to the testimony of these witnesses in whole or in part on the basis of admissibility, relevance, hearsay, or other grounds.

### Alisa Robere's Healthcare Providers

1.  Nidia Iglesias, MD

2.  Janice Moscoso, MD

3.  Jose Carugno, MD

**Pauline Richard's Healthcare Providers**

1.  Niloufer Kero, MD

2.  Richard Chlouber, MD

**Melody Braxton's Healthcare Providers**

1.  Patricia Turner, ARNP

2.  Maria Martino-Villanueva, MD

THIS, the 18th day of August 2025.

Respectfully submitted,

*/s/ Caroline D. Walker*
Caroline D. Walker
Butler Snow LLP
Alabama Bar No. ASB-3439-B10T
One Federal Place
Suite 100
1819 Fifth Avenue North
Birmingham, AL 35203-2118
Telephone: (205) 297-2200
caroline.walker@butlersnow.com

*/s/ Kasey M. Adams*
Butler Snow LLP
Mississippi Bar No. 105025
Renaissance at Colony Park
Suite 1400
1020 Highland Colony Parkway
Ridgeland, MS 39158
Telephone: (601) 985-4413
kasey.adams@butlersnow.com

***Co-Lead Counsel for The Cooper Defendants***

/s/ Lori G. Cohen
Lori G. Cohen
Allison Ng
Greenberg Traurig, LLP
Georgia Bar No. 174455
Terminus 200
3333 Piedmont Rd., NE
Suite 2500
Atlanta, GA 30305
Telephone: (678) 553.2385
cohenl@gtlaw.com nga@gtlaw.com

**Co-Liaison Counsel for Defendants**

## **CERTIFICATE OF SERVICE**

I certify that on this 18th day of August 2025, a copy of the foregoing CooperSurgical's Non-Retained Expert Disclosures was served electronically on Plaintiffs via their Lead and Liaison counsel.

*/s/ Caroline D. Walker*
Caroline D. Walker